[No. 13202.   Department Two. — February 27, 1890.]

## J. S. DOE, RESPONDENT, *v.* CASPER M. SANGER ET AL., APPELLANTS.

MINING CLAIM.— LODE LOCATION — PARALLELISM OF END LINES. — A substantial compliance with section 2320 of the Revised Statutes of the United States, requiring the end lines of each claim located upon a vein or lode to be parallel, is all that is required.   A location may be made in such an irregular and many-sided shape as to destroy the right to work the vein beyond the surface lines; but the object of the statute is sufficiently met to sustain that right if the location is made lengthwise of the vein in a quadrangular shape, though the end lines are not exactly parallel; and the locator has a right, and perhaps it is his duty, within any reasonable time, to make the end lines parallel, if such change does not interfere with the substantial property rights of any other person. The purpose of the statute is to prevent a party from claiming more width of vein outside his surface lines than within them.

APPEAL from a judgment of the Superior Court of San Bernardino County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*A. F. Hatch*, and *Harris & Gregg*, for Appellants.

*Charles J. Perkins*, *H. C. Rolfe*, *Byron Waters*, and *R. S. Mesick*, for Respondent.

McFARLAND, J.—Plaintiff brought this action to recover damages for the alleged excavating, carrying away, and converting to their own use by defendants of large quantities of silver-bearing ore belonging to plaintiff. The verdict and judgment were for plaintiff; and defendants appeal from the judgment, and from an order denying their motion for a new trial.

There is one main question in the case, which we will examine first, as the others are of comparatively little importance.

Plaintiff is the owner of a ledge or lode location and mining claim known as the Oriental.   A portion of

this claim was sometimes called Oriental No. 2, and another portion called Oriental No. 7; but for present purposes it is sufficient to call the whole the Oriental. Adjoining the Oriental, and lying to the north of it, is another ledge or lode location and mining claim owned by defendants, and called the Silver King. The southerly side line of the Silver King is the northerly side line of the Oriental. At one stage of the trial there seemed to be a question as to whether or not there was a small vacant strip between the two locations; but that question cuts a very little figure in the case, and we assume at present that the southerly line of the Silver King and the northerly line of the Oriental were identical. The defendants, in working the Silver King at various depths beneath the surface, drifted across the common line of the two mines and took out ore within the surface lines of the Oriental; and it was for the value of this ore so taken that this action was brought.

The defendants averred as a defense, and offered evidence to sustain it, that there is a vein or lode of silver-bearing ore the top or apex of which is within the surface lines of the Silver King extended downward vertically· that said vein, in its downward course, departs so far from a perpendicular as to extend outside the vertical southerly side line of the surface location of the Silver King, and to enter under the surface lines of the Oriental; and that whatever ore defendants may have taken within the side line of the Oriental was taken in the exercise of their right to follow the dip of the said vein, the apex of which was within the surface lines of said Silver King. The court below ruled out this defense, and kept it away from the jury, for the reason — and for the sole reason — that in the original location of the Silver King the end lines were not parallel. There is no pretense, as we understand it, that the location was not sufficient, or that it did not comply with mining customs and the laws of Congress in every

other respect.   Neither is there any claim that the loca-
tion was of more surface ground than the law allows; as
a matter of fact, it was less than fifteen hundred feet
along the ledge, and considerably less than six hundred
feet in width.   And it cannot be contended that the
location was of such a shape that the end lines could
not be readily distinguished from the side lines.   It had
only four lines,—two longer ones running with and on
either side of the course of the vein, and two shorter
ones running across it.   It was evidently intended to be
in the usual shape of a quartz location,—that is, a rec-
tangular figure, with greater length than breadth; but
T. C. Warden, who discovered and located the mine in
April, 1881, failed to get the end lines parallel.   The
divergence from a parallel was about 250 feet; that is,
for instance, the southerly end of the westerly end line
should have been about 250 feet farther east in order to
have been exactly parallel with the easterly end line.
Moreover, defendants offered to prove that in March,
1882, less than a year after the original location by
Warden, their west end line was "drawn in" so as to
make it parallel with the east end line; that since then
they were in the peaceable possession of the mining
claim within the lines, as they were after said west end
line had been so made parallel; that the ore which they
took from within the surface lines of the Oriental was
part of the vein which had its apex within the surface
lines of the Silver King after said west end line had been
so made parallel; and that said ore was taken out after
the said change of said west end line.   The plaintiff
objected to the offered evidence, and to any similar evi-
dence, "on the ground that, by reason of the surface,
form, and shape of the Silver King claim, as testified to
by said Warden, defendants have no rights, under the
laws of the United States, or otherwise, to follow the lode
in its downward course (beyond) the lines of the Silver
King claim and under the other claims, the end lines of

such location, testified to by said Warden, not being parallel, but divergent." The court sustained the objection, in these words: "The objection to any proof of justification, or otherwise, under the location by Mr. Warden, as shown by map No. 1, of defendants to take subterraneous ore from within the vertical side lines of the Oriental No. 2 and the Oriental No. 7 mining claims extended downward is sustained." Defendants excepted. And so the court held that the location of the Silver King, made by Warden in April, 1881, was totally invalid and void, so far as any right under it is claimed to pursue a vein outside its vertical side lines, because its end lines were not parallel, and that such invalidity was not overcome by the said rectification of the west end line in March, 1882. The same ruling was made at many other stages of the trial; and the only matters submitted to the jury concerned the entry of defendants within the lines of plaintiff's ground, and the amount and value of the ore extracted. And in making these rulings, we think that the court below erred.

For another purpose, evidence *was* admitted which showed that at the time — in March, 1882 — when the west end line was made parallel with the east end line, as aforesaid, the owners of the Silver King had made application for an official survey of their mine preparatory to applying for a United States patent; that J. C. Dunlap, a mining engineer and surveyor, at the request of the United States surveyor-general, had made such survey, and that, finding the end lines not parallel, he ran a new west end line, commencing at the northwest corner of the original Warden location, and drawing it in easterly to the original southerly side line so as to make the two end lines parallel, as before stated; that in doing so he kept along and within the original lines so as to make the surface ground less and not more than the original; and that he placed permanent monuments on the new southwest corner and on the end line. There

was also evidence admitted tending to show that from that time the new line run by Dunlap was recognized as the west end line, although there was also some evidence tending to show that some of the owners of the mine were at first dissatisfied with that line. But in 1885 an application for a United States patent was made, based on said survey made by Dunlap. None of this evidence, however, was allowed to be considered as a justification of defendant in following their vein outside of their side line. The defendants also offered to amend their answer, so as to aver and prove that on July 20, 1887, less than one month after the commencement of this action, defendants made mineral entry and purchase of the Silver King, according to said Dunlap survey, in the United States land-office of the district where the claim is situated. This offer was denied by the court.

The following diagram shows the shape of the Silver King surface ground: —

SILVER KING MINE.
Defendants' Exhibit No. 1.

SCALE 640′ = 1″

The four outside lines are those originally made by Warden; the dotted line shows the alteration of the west end line made by Dunlap, who followed all the other lines made by Warden. The points at which defend-

ants drifted under the Oriental are near the center of the southerly line of the Silver King.

The theory of respondent, upon which the case was tried in the court below, is based on the last line of section 2320 of the Revised Statutes of the United States, which is as follows: "The end lines of each claim shall be parallel with each other"; and his position is, that as the end lines of the Silver King, as originally located, were not parallel, therefore its owners *could not follow a vein* beyond the vertical side lines of the location. We do not understand respondent to contend that such a location as that of the Silver King is void for all purposes. Indeed, we understand his counsel to admit that it is *good* for all purposes, except only for the purpose of going underground outside of the surface lines. But — if the question were important here — it would be difficult to logically maintain that distinction. Section 2320, which provides for the parallel end lines, does not give the right to follow a vein beyond the surface lines. It does not provide that *if* the end lines are parallel, the vein may be followed; and if they are not, then the vein may not be followed. It deals merely with *locations* generally, — with locations for all purposes. But section 2322, which *does* give the right to so follow a vein (and which is little more than a declaration of a previous mining custom), says nothing about parallel lines. If, therefore, the provision of 2320 about end lines is to receive the strict, literal, narrow, mandatory construction contended for by respondent, it is difficult to see why a location like that of the Silver King is not totally void for all purposes, or for any purpose.

But we do not think such a construction of section 2320 is admissible in any view, or for any purpose. It would include absolute *mathematical* parallelism; for if the divergence of a few feet in a distance of six hundred feet would not vitiate a location, why should any reasonable divergence which does not materially change the

figure of the location from that of a parallelogram? The intention of the statute was to make the valuable property rights of lode-miners to depend upon things more substantial and important than the mere trick of a perfectly correct measurement of surface ground, or a mathematically accurate survey. A substantial compliance with section 2320 is all that is required. In the *Eureka Case,* 4 Saw. 302, Mr. Justice Field says: "In the second place, the provision of the statute of 1872 (the same as section 2320 of the Revised Statutes), requiring the end lines of each claim to be parallel with each other, is merely directory, and no consequence is attached to a deviation from its direction."

But section 2322, which gives the right to follow veins beyond surface lines, *does* contain some provisions about that right which are important. By that section a vein can be followed outside of the *side lines* only, and not outside of the end lines. And so a surface location might be made in such an irregular and many-sided shape as to destroy the right to go beyond the surface lines. That consequence, however, would not be because the end lines were not exactly parallel, but because it would be difficult, if not impossible, to tell which were side lines and which were end lines. In the *Flagstaff Case,* 98 U. S. 467, in *Elgin M. Company* v. *Iron S. M. Company,* 14 Fed. Rep. 397, and in other decisions, it has been held that the provisions of the federal statutes relating to lode claims were passed with the understanding, founded upon the general practice of miners, that the surface locations of such claims will be made lengthwise along the general direction of the lode or vein in the general form of a parallelogram, with the s. de lines along the lode and the end lines across it. But suppose that a surface location should be made, for instance, in the shape of an octagon (and such was nearly the shape of the location in the case reported in 118 United States, hereinafter mentioned), in such a case there would be no end

LXXXIII. Cal.—14

lines and no side lines, and if the locator could go outside his lines in one direction, he could do so in eight directions, and encroach upon his neighbors from every point of the compass. If, however, a location is made in substantial compliance with the intent of the statute,—that is, where there are two side lines running along the course of the vein, and two shorter end lines running across it, so that the two sets of lines are distinct and apparent,—such a location is not void, but gives the right to follow a vein laterally, although the original end lines may not be exactly parallel, or although they may differ from a true parallel as much as they did in the case of the Silver King. In the case at bar it is not pretended by respondent that the place in the Oriental where the ore in question was taken by appellants was not "between vertical planes drawn downward" through the end lines of the Silver King, and "continued in their own direction," or that such would have been the fact if said end lines had been perfectly parallel, or that he was injured in any way on account of said end lines not being parallel, or that the situation and state of facts between the two claims, so far as this issue involved is concerned, would not have been just the same if said end lines had been exactly parallel. What he contends for is the mere *technical advantage* of denying appellants' right of working their lode in the usual way on account of the said manner in which the end lines of the Silver King were originally located. His counsel argue as if the right of a quartz or lode miner to follow his vein laterally is a piece of extraordinary legislative grace and favoritism different from the usual dominion which men have over their property, and, therefore, to be contracted and circumscribed in every direction by strict construction. But this is a mistaken view of the subject. That which a lode-miner locates, that which he seeks to secure, that which constitutes his valuable property in the mine, is *the lode itself*, and the right to

mine it, wherever it may go underground, between the
end points of his location. This right was not given, in
the first instance, by the act of Congress. Of course, as
the United States government owned the land, and the
right to mine was a mere license from that government,
Congress might have greatly changed that right, or
might have withdrawn the license entirely. But it did
not do so. The statutes of Congress upon the subject,
except so far as they provided for patents, were little
more than mere formal legislative declarations of what
had before rested in unwritten consent. They followed
mainly the customs which miners exercising the license
had established among themselves, and which fixed the
character and incidents of mining property. And one
of the inherent and most valuable qualities of property
in a lode mine, as fixed by those customs, was the right
to mine the lode to indefinite depths, although it might
so far depart from a perpendicular in its downward
course as to extend outside the vertical side lines of the
surface location.

Counsel for respondent, in support of their main con-
tention, cite the case of *Iron Silver Mining Co.* v. *Elgin
Mining Co.*, 118 U. S. 196.) The language of the opin-
ion of the court in that case must be considered with
reference to the facts of the case, and the points which
were before the court for decision. The question in-
volved was the right of the defendants therein, who were
the owners of a lode location called the Stone claim, to
follow a vein, the apex of which was within the surface
lines of said claim, into an adjoining claim owned by
plaintiffs, called the Gilt Edge claim. When defendants
offered evidence to prove their right to follow their vein
into the Gilt Edge ground, the plaintiffs objected, be-
cause, "by reason of the surface, *form, or shape* of the
Stone claim, its owners had no right" to follow, etc., and
because "no part of the Gift Edge claim, or the mineral or
lode within it, was *within vertical planes drawn downward*

*through the end lines* of the Stone claim, and continued indefinitely in their own direction." (Pages 202, 203.) The objection there was *not* that the end lines of the Stone claim were out of parallel; and as a matter of fact, what were claimed to be the end lines *were* parallel. The objection rested on the general "form or shape" of the Stone surface location, and on the fact that the disputed ore in the Gilt Edge was not within vertical planes drawn through the end lines of the Stone claim. The objection was very properly sustained, as a glance at the Stone surface location will at once show. The following is a diagram of that location, copied from page 203 of the report:—

Here is a surface location with nearly a dozen exterior lines, with no distinguishable side line or end lines, made in extreme violation of the usages and principles of location recognized by the statutes, and which, if it gave any right to follow a vein at all, would give the right to follow veins in nearly a dozen different direc-

tions. The lines which are designated as end lines are not end lines at all. The one designated as the south end line — from the figure 6 to the figure 5 — would, if extended, run through the center of the location; and, as stated in the opinion, the ore taken from the Gilt Edge was not within planes drawn through the asserted end lines. As was said by the learned judge of the circuit court who tried the case: " With superficial attention to the letter of the law, and in utter ignorance and disregard of its principles, the two lines were made in equal length, and parallel with each other, but so arranged that they can never perform the office assigned to them in the law." It is true tl at in the opinion of the supreme court of the United States rendered in this case the language of the statute about end lines being parallel is restated; but the meaning of that language, as applied to a case like the one at bar, different entirely in its facts from the one then before the court, was not given, and was not before the court. And it may be noticed that the opinion of the court was delivered by the same learned justice who said in the *Eureka Case, supra,* that the provision was only directory. A comparison of the two diagrams above given of the Silver King and the Stone will clearly show the difference between the two, and that the principle upon which the Stone case was decided does not apply at all to the case at bar.

Of course, where end lines diverge to any considerable extent from a perfect parallel, they might, when extended in their own direction, include, on one side at least, greater length of ledge outside the side lines than within them; and in such case, if the owner undertook to mine outside ore on or near the diverging end line, some difficulty might arise; and it was, no doubt, the purpose of section 2320 to prevent a party from claiming more outside his lines than within them. But no such question arises in this case. Moreover, we think that defendants should have been allowed to show, as a part of their de-

fense, that in March, 1882, — less than a year after the original location, — they rectified their west end line, by means of an official survey, so as to make it parallel with the east line, and that in 1885 they applied for a patent upon that official survey, provided that no injury was done thereby to plaintiff. And it is difficult to see how there could have been any such injury; because by such rectification defendants had less ground within their surface lines, and the vertical end lines extended in their own direction over plaintiff's claim included less of the ledge than they did before, although both before and after the rectification they included the place where the disputed ore was taken out. Is it possible that a prospector, discovering a lode mine on a wild and rugged mountain-side, and locating it in substantial compliance with mining customs and congressional laws, must inevitably lose what may be the most valuable part of his discovery, simply because he failed, in the first instance, to run his end lines on a perfect parallel? Such a locator has the right, and perhaps it is his duty, to make such change as is necessary to parallel his end lines, the next day, or the next month, or within any reasonable time, if such change interferes with the substantial property rights of no other person. Any different rule would be a disgrace to justice, and an impeachment of the common sense of law-makers.

For the foregoing reasons, the judgment must be reversed; and in looking again over the transcript we see no other points made by appellants which seem to need special mention, or that will create any difficulty if there shall be another trial of the case.

The judgment and order are reversed, and cause remanded for a new trial.

THORNTON, J., and SHARPSTEIN, J., concurred.

Hearing in Bank denied.