CARSON CITY GOLD & SILVER MIN. CO. v. NORTH STAR MIN. CO.

(Circuit Court, N. D. California. March 16, 1896.)

1. MINES AND MINING—SURVEY AND PATENT—SIZE OF SURVEY.

While the law prescribes a limitation as to the size of a single location, there is no limitation to the number of claims one person may hold by purchase, or that may be included in a single patent, or, it seems, in a single survey, showing only the exterior boundaries, and omitting all interior lines of the several smaller claims. Polk's Lessee v. Wendell, 9 Cranch, 87, and Smelting Co. v. Kemp, 104 U. S. 636, applied.

**2. SAME—EFFECT OF PATENT INCLUDING SEVERAL CLAIMS.**

The question of the right to a patent covering several vein or lode claims, before parallelism of the end lines was required, is within the jurisdiction of the land department; and after the same is determined by it, and a patent issued, the boundary lines as defined by the patent are the lines by which the rights of the parties are to be determined, and the patentee cannot be compelled to rely upon the lines of the several claims of which the patented survey is composed.

**3. SAME—RIGHT TO FOLLOW DIP—VEIN TERMINATING WITHIN A CLAIM.**

When the apex of a vein crosses one end line of the claim and runs in the direction of its length, but is cut off, before reaching the other end, by a "crossing," so that it terminates at that point, the right to follow the dip will be confined between the vertical planes of the one end line and a new end line parallel therewith, drawn at the point where the vein disappears.

W. H. Dickson, A. C. Ellis, and C. W. Kitts, for plaintiff.
Curtis H. Lindley, for defendant.

BEATTY, District Judge. This is an action of trespass brought by the plaintiff, as owner of the Irish-American mining claim, situated in Nevada county, Cal., against the defendant, which, as owner of the North Star claim, has followed and worked its ledge, upon its descent, under the surface of the former claim. Each claim is a

consolidation of a number of small claims, many, if not all, of which were located long prior to the enactment of any mining law by congress, and is patented in the irregular shape and of the unusual size represented upon the following plat; the Irish-American being about 1,500 feet square, with a strip extending from the main body about 600 feet east, and the North Star, lying 300 to 400 feet south. is about 3,100 feet long from east to west and 650 to 1,250 wide. The plaintiff's theory is that the apex of the North Star ledge runs so near northwesterly and southeasterly that, if continued in its course, it would cross the side lines, 1, 2, and 3, 4, of the claim; but that the ledge, in its northwesterly course, before reaching the north side line, is interrupted by a nearly perpendicular north and south fissure, or, at least, a distinct line of change in the geological formation of the country, called, in this case, a "crossing," to the west of which the ledge does not appear either upon the surface or in the underground workings. The defendant claims that the apex of its ledge runs in an easterly and westerly direction from end to end, and along the center of its North Star claim, and that its dip is northerly, or practically in the direction of its main working shaft, and, while admitting the existence of the crossing, affirms that the ledge continues to the west of it. The surface of the claim is so covered with soil, and any outcroppings of a ledge that ever may have existed are so obliterated by past mining operations, that very little can now be determined, by surface indications, of the course of the ledge. Perplexity is added from the fact that, over much of the surface, there are many old mining shafts and workings, in which more or less ore has been found, and which are in such relative positions that they are no guide to the location of the course of any ledge. A portion of them are represented on the plat by dots and crosses.

1. During the trial plaintiff objected to defendant's evidence, based upon the North Star claim as patented, and insisted that the claims of which it is composed should be shown as originally located, and that the rights of the parties should be governed by the located lines of those claims, and not by the patented lines of the North Star. This objection was overruled, and as, upon final argument, plaintiff insisted upon its objection, a brief consideration of it will precede any discussion of the other issues. In this objection are involved the questions of the parallelism, and of the intersection by the ledge, of the end lines of the original locations. When those locations were made, there was no law requiring such parallelism, but, independent of all lines, the right to follow the ledge along its course for the full distance claimed, and underground upon its true dip, to any depth, was undisputed. Although section 9 of the act of 1872, in repealing certain parts of the old law, provided that "such repeal shall not affect existing rights," the courts have held that, when any claim is patented, those rights are controlled by the patented lines.

If, however, plaintiff's objection could so far prevail that defendant should be compelled to rely upon the original claims as located, instead of upon the North Star patent, it ought to follow that they should be considered as unpatented claims, and all rights which attached to them prior to patent should accrue to defendant; for, man-

ifestly, defendant cannot be deprived of all benefits arising from its North Star patent, as well as those which attached to the original locations while unpatented. Moreover, the defendant, owning the several claims which now compose the North Star, might have procured separate patents for each claim, and in doing so might have so changed the end lines as to make them parallel, just as is always done now in application for patent; and, if the several claims jointly included the entire apex, all the claims could have been so surveyed as to make all the end lines parallel to each other, and thus give it what it now substantially claims by its North Star patent. The defendant has only done, by one act, at less expense, what it lawfully might have done by several acts, at greater expense. The North Star patent is of greater superficial area than any law has ever authorized for a single-ledge location; but it has been held by the supreme court that, while the law prescribes a limitation to the size of a single location, there is no limitation to the number of claims one person may hold by purchase, or that may be included in a single patent, and, as I understand, that may be included in a single survey, showing only the exterior boundaries, and omitting all interior lines of the several smaller claims. Such was the holding as to agricultural lands in Polk's Lessee v. Wendell, 9 Cranch, 87, and as to placer claims in Smelting Co. v. Kemp, 104 U. S. 636. There appears no reason why the same rule should not apply to quartz claims.

Independent, however, of the foregoing consideration, a patent has been granted for the North Star claim. It has passed beyond the field of discussion that a patent cannot be collaterally attacked on account of any question which the land department could lawfully determine before issuing it. Without now defining what questions are settled by the issuance of a patent, it is held that the question of the defendant's right to a patent to the North Star, with the boundaries as defined by it, was within the jurisdiction of the department, and was determined by it, from which it is held to follow that the boundary lines, as defined by the patent, are the only lines by which the rights of the parties can be determined. To adjudge such rights by the original lines of the several claims of which the North Star is composed would be such an assault upon the patent as cannot be sustained. The former ruling upon plaintiff's objection is therefore adhered to.

2. Without making special reference to the testimony of the several witnesses as to the location and course of the apex, it may be concluded, as clearly established, that a ledge had been found in a number of the group of old shafts existing near the south side line of the North Star. Upon one of the plaintiff's maps is indicated a line of shafts running east and west, which is marked "Shafts on Apex." Plaintiff's witness Hugunin was on the ground the day this ledge was discovered, in 1851, and located a claim running west from the main shaft, and he fixed a point, designated "B" on the plat, being over 100 feet westerly from the mouth of the main shaft, as within his claim, and as the most westerly cropping of the ledge. He also located the apex of the ledge 50 feet south from the mouth

of the Larimer shaft, and 40 to 50 feet south of the old powder house, which was on a direct line connecting the mouths of the main and Larimer shafts. An apex running through these three points fixed by this witness, and continued in its own direction each way, would cross the south side and west end line of the North Star, and the same result would follow to pass a line through these points and the group of shafts. I do not think that, from a fair consideration of all the plaintiff's evidence, it can be concluded that the course of the ledge is across both the side lines. On the contrary, defendant's witnesses locate the apex easterly and westerly near the center line of the claim as indicated upon the plat, and the witness Morse located croppings at the point designated "O," being about 300 feet west from the mouth of the main shaft, and he says that he and his associates located 10 claims, running west from the Auburn road, "as near as we could tell, on the line of the ledge." Defendant's witnesses are corroborated by other established facts: (a) Before the surface was disturbed, and when indications of the ledge were clearer, the original locations were made upon an east and west line, and about along the central line of the North Star. (b) The workings of a mine, made in mining operations, and not in support of litigation, are generally important as evidence of any facts which may be legitimately inferred from them. The three incline working shafts were started upon this North Star central line, and are all shown to follow the ledge in their descent. It is reasonable to presume they were started upon or near the apex of the ledge. (c) The working levels in this case are not so conclusive as usual of the course of the ledge for the reason that there are large "horses" in the mine, to the upper and lower surface of which the workings have conformed, which largely accounts for the varying directions the levels have taken.

A majority, or many, of the upper levels are nearly parallel with the north side line, while others, if prolonged, would cut the west end and south side lines, and still others would cross both side lines, and especially those in the deeper workings. But, as ledges may, in their depths, change their course, and as the surface course or the course of the apex is to govern the miners' rights, the workings nearest the surface are better guides to the course of the apex than those far below. Plaintiff admits that there is a mineral vein along the line claimed by defendant as the apex, but says it is but a spur or seam from the ledge, which runs elsewhere; its exact locality not being fixed. That this is but a spur or seam of a ledge, and so unimportant that it cannot be made the basis of a mineral location, cannot be reasonably concluded, when it is remembered that the first locations were made upon and along it. Moreover, the law fixes no limit to the size or prominence of a mineral-bearing vein before a mining location can be made upon it. While, in the group of shafts referred to, a ledge was found, its apex, or the course of the apex, has not been located, unless it be by the plaintiff's testimony concerning the "shafts on apex" before named; and it has not been shown that any vein crosses, or is found beyond, the south side line. It is not impossible that the apex of whatever vein exists at this

place, if traced out, would assume a course somewhat corresponding to the outline of the group of shafts, and running in a northeasterly and a northwesterly direction until it unites with the other line of apex, and that the two outcrops or ledges are but parts of one vein, which are separated by a large "horse," which defendant's evidence and diagrams show exists near the surface of the mine. There is some evidence, at least, to show that two veins do unite in the workings not far below the surface.

From a full consideration of all the evidence it is concluded that the first mining locations were located along the central line of the North Star claim; that such line is practically the line of the apex of the ledge in controversy; that it has been fixed at different points along the irregular lines indicated upon the plat between the letters "C" and "D" and running in a direction south about 80 degrees east.

3. Generally, when a ledge has been traced for such a distance, in a claim of this size, it would not be an unreasonable presumption that it would continue in the same direction far enough to cross the end lines of the claim. This presumption may be indulged as to the east end line, but, as before stated, plaintiff asserts that it does not, either on the surface or underground, pass west of the "crossing," which contention is sustained by its testimony, while that of defendant is to the contrary. Underground there may be some indications of a ledge west of the crossing; but little, if any, ore has been found there, and the workings of the mine, with some unimportant exceptions, sustain plaintiff's contention. Upon the surface there is nothing shown by which to definitely locate the line of this crossing. Conceding, however, that the ledge intersects the east end line, from whence it extends no further than about 2,200 feet westerly, to the point "C," fixed by the witness Morse as the place where he found the croppings of the ledge, what are defendant's underground rights? That the end lines are not parallel cannot be the basis of an objection, because their convergence, when extended in the direction of the dip of the vein, would give defendant less, instead of more, than the law provides for.

Attention has not been called to any precedent in which a ledge is abruptly terminated in its onward course, as is claimed occurs in this case; but a similar principle is involved when a ledge, passing through an end line, is terminated, as to the claim, by going through and out of it across a side line. Under such circumstances, it has been held that the ledge may be followed, on its descent, between the perpendicular plane drawn through such intersected end line and another similar parallel plane passing through the point where the ledge crosses the side line. Last Chance Min. Co. v. Tyler Min. Co., 9 C. C. A. 613, 61 Fed. 560–564; Consolidated Wyoming Gold Min. Co. v. Champion Min. Co., 63 Fed. 541–546; Del Monte Mining & Milling Co. v. New York & L. C. Min. Co., 66 Fed. 212; Fitzgerald v. Clark (Mont.) 42 Pac. 273, which were followed in the last hearing of Tyler Min. Co. v. Last Chance Min. Co., 71 Fed. 848. When the last case was first before the circuit court of appeals, that court said:

"If the lode in question, instead of extending into the Last Chance location, had abruptly broken off within the surface lines of the Tyler, near the point

where, in fact, it crossed the line, there could certainly be no question as to the right of the Tyler to follow the lode or vein, in its downward course, for its entire depth, outside of the vertical planes drawn through the side lines. The fact that it continued its course, and crossed the side line, does not in any manner change this principle. In either case, the locator is entitled to the same rights. In such cases, the end lines are not necessarily those which are marked on the ground as such. An end line may be drawn at the point where the lode abruptly terminates within the surface lines, or at the point where the apex of the lode crosses the side line of the surface location." 4 C. C. A. 329, 54 Fed. 292.

It is therefore concluded that the defendant may follow its ledge on its descent under the Irish-American claim, and to any depth, between a perpendicular plane drawn through the east end line of its claim and another similar parallel plane crossing such claim at the point fixed as the western terminus of the ledge, being designated by "C," and westerly from the east end line 2,200 feet, measured along the straight central line upon the plat, and along the like line upon defendant's Exhibit 8: provided, that defendant shall in no event pursue its ledge west of a perpendicular plane extended through the west end line of its claim; and judgment for defendant is ordered accordingly.

There was another question suggested, but, as it was based upon the theory that the course of the ledge was such as would carry it across the side lines, which I cannot adopt, it will be unnecessary to consider it.