### GRANT et al. v. PILGRIM.
### No. 8463.

Circuit Court of Appeals, Ninth Circuit.
March 16, 1938.

564

Chas. E. Taylor and Cecil H. Clegg, both of Fairbanks, Alaska, and Ira S. Lillick and Edwin L. Gerhardt, both of San Francisco, Cal., for appellants.

Julien A. Hurley, of Fairbanks, Alaska, for appellee.

Before WILBUR, DENMAN, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

This is an appeal by O. M. Grant, David Mutchler, and John Mutchler from a decree against them declaring a trust in favor of appellee Edna G. Pilgrim to certain interests in a mining lode claim, together with a money award against each in an accounting of the proceeds of mining on the claim conducted by them and one George Mutchler. George Mutchler was named as a defendant, but was not served with process, and did not appear in the case as a party, although he appeared as a witness.

Two lode mining claims join with a common northerly and southerly line. One called the Irishman No. 1, or Irishman, lies to the east, and one called the Wasp, lies to the west of this line. There is a claim called Irishman No. 2, but it is not involved in this action.

The plaintiff in the trial court, appellee here, owns a one-half undivided interest in the Irishman and is-cotenant with the owners of the other one-half interest, the de-

fendant Grant and his grantees. Grant and George Mutchler were prospecting the Wasp claim while they were mining on the Irishman side of the separating line. While thus engaged, they purchased the Wasp for $300.

The plaintiff alleges and the court found that while they were thus engaged they discovered that the vein in which they were mining was under the surface of the Irishman and was in fact an extension of a lode having its apex or top under the surface of the Wasp claim. That is, while the upper portion of the ore-bearing vein was on the Wasp, it slanted easterly on its downward course until it passed under the surface of the Irishman claim. This is called the "dip" of the ledge. The apex is the top of the ledge as it extends lengthwise along the claim.

■ The owners of a claim containing the apex of a mining vein, either outcropping or not, may follow this vein along its dip under the surface of any other claim within the end lines.

"The locators * * * shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations." 30 U.S.C.A. § 26, Rev.St. § 2322.

■ If, then, the apex of the ledge being mined is situated within the Wasp's boundaries or under the Wasp's surface, the minerals in this ledge under the surface of the Irishman and between the Wasp end lines extended may be taken by the Wasp owners.[1] 30 U.S.C.A. § 26, Rev.St. § 2322; Tyler Mining Co. v. Last Chance Mining Co., 1895, C.C., 71 F. 848; Lindley on Mines, 3d Ed. § 581 et seq. The right to take minerals in such circumstances is called "extralateral" rights. All minerals lying below and within a claim's boundaries belong prima facie to such claim, but such claim yields to this "extralateral rights" rule.

Grant and the defendants, so plaintiff alleges, secretly and fraudulently purchased

[1] It is provided by 30 U.S.C.A. § 23, Rev.St. § 2320, that a mining claim shall not exceed 1,500 feet "along the vein or lode," but no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. "No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface. * * * The end lines of each claim shall be parallel to each other." This quotation from the statute requires comment upon "discovery" and parallel end lines. Discovery is treated fully in Lindley on Mines, § 335 et seq., 3d Ed. The general doctrine being that claims rest upon a discovery of a mineral-bearing vein giving reasonable promise of commercial value. Larkin v. Upton, 144 U.S. 19, 24, 12 S.Ct. 614, 36 L. Ed. 330. But claims may be staked and located before discovery and the discovery perfects the claim rights. Creede, etc., Min. Co. v. Uinta Tunnel Min., etc., Co., 1905, 196 U.S. 337, 25 S.Ct. 266, 49 L.Ed. 501; Union Oil Co. v. Smith, 1919, 249 U.S. 337, 39 S.Ct. 308, 309, 63 L.Ed. 635; Cole v. Ralph, 1920, 252 U.S. 286, 40 S.Ct. 321, 64 L.Ed. 567; Book v. Justice Mining Co., 1893, C.C.Nev., 58 F. 106; Chrisman v. Miller, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770; Cameron v. U. S., 1920, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659.

It has been held that the failure to locate with parallel lines does not invalidate the location; approximate parallelism, considering circumstances, is sufficient. Cheesman v. Shreeve, 1889, C.C., 40 F. 787; Tyler Mining Co. v. Sweeney, 1893, 9 Cir., 54 F. 284, 293; Last Chance Mining Co. v. Tyler Mining Co., 1894, 9 Cir., 61 F. 557; Doe v. Sanger, 1890, 83 Cal. 203, 23 P. 365. See, also, Lindley on Mines, 3d Ed., p. 1303.

Also, end lines not parallel may be relocated so as to cure this defect and end lines may be made parallel when the government issues its patent. Doe v. Waterloo Min. Co., 1893, C.C., 54 F. 935, 941; Tyler Min. Co. v. Sweeney, supra. See, also, Lindley on Mines, 3d Ed., p. 1304.

Also, if end lines converge in the direction of the dip the extralateral right may be taken within the converging lines extended to their juncture. This applies to the instant case. Judge Beatty reasons that converging lines limit the extralateral area, and therefore no one can complain. Carson City Gold & Silver Mining Co. v. North Star Mining Co., 1896, C.C., 73 F. 597, 602. And see Carson City Gold & Silver Min. Co. v. North Star Min. Co., 1897, 9 Cir., 83 F. 658, 669; Bunker Hill Co. v. Empire State Idaho Co., 1901, 9 Cir., 109 F. 538, 540; Lindley on Mines, 3d Ed., p. 1300, 1302.

the Wasp, thereby acquiring extralateral rights pertinent to such lode which constitutes an outstanding adverse title to her title and interests in the Irishman. As a cotenant plaintiff claims the right to share in the purchase, and upon learning of it she promptly tendered payment to Grant and George Mutchler, the purchasers, of one-half the purchase price, but this they refused to accept.

A dispute exists between the parties as to the correct location of the line dividing the two claims. If the plaintiff is right, the mining shaft is sunk immediately east of the line dividing the two claims and practically all of the paying ore has been extracted from beneath the surface of the Irishman. If Grant and the Mutchlers are right, this paying vein is under the surface of the Wasp. The trial court found in favor of the plaintiff upon this issue.

The location of the line between the Irishman and the Wasp depends on where the southwest corner of the Irishman was placed, since there is no dispute about the position of the northwest corner, or of any of the other corners. Putting it more definitely, defendants claim the southwest corner is considerably to the east of the location the plaintiff claims it to be.

We use a reproduction of Defendants' Exhibit C for clarity and for survey data.

## NOTES EXPLAINING THE MAP:

The map is a reproduction to scale of Defendants' Trial Exhibit C.

In the original the scale of 1 inch equals 200 feet and in the reproduction 1 inch equals 400 feet.

The southerly extension line from corner 3 of Irishman No. 1 is marked "S. 8° 01' W. 1633 ft. Cor. No. 3. Sur. 847," on the original.

The southerly extension line from corner 4 of Irishman No. 1 is marked "S. 0° 30' W. 2087 ft. to cor. No. 3 Sur. 847" on the original.

The shaded drawing north-center Irishman represents the "Irishman Lode" workings.

The irregular drawing near southeast corner Wasp represents the "Wasp Lode" workings.

By extending the southerly line of Irishman westerly by the proper scale 154.5 feet and conecting the point so ascertained with corner 1, or the northwest corner of Irishman, it will be seen that the mine workings on the Wasp lode fall to the east of this line, which is the true dividing line between the Wasp and the Irishman claims.

This is in complete accord with Earl Pilgrim's testimony that the true line between the Irishman's northwest and southwest corners passes immediately west of the Wasp lode shaft.

The extralateral rights of the Wasp lode owners as the dip extends easterly under the Irishman are confined to the area lying southerly of the Irishman north line and northerly of an extension across the Irishman of the Wasp's southerly line.

The true line between Wasp and Irishman, and the extension of the Wasp end lines across the Irishman, are sketched in by dashes and are not parts of the exhibit as introduced in evidence.

The locator of the Irishman, Earl Pilgrim, testified that he and Grant staked the claim in June, 1928; that in 1933 the southwest stake was gone; he found a stake below the road at approximately where Grant had placed it on a former location of a claim called "Gold Lode"; this stake was marked "southwest corner Irishman No. 2." The distance between the place where he staked the southwest corner and this stake was approximately 155 feet. Grant testified that the stake marked "southwest corner Irishman No. 2" was the true southwest corner of Irishman No. 1, that he had mistakenly written a "two" on the stake instead of a "one." Pilgrim also testified that later he went upon the ground with surveyor, John Quenboe, and pointed out the place where he put the southwestern stake of the Irishman No. 1, and that, further east, he and Quenboe found the stake Grant had mistakenly marked "southwest corner Irishman No. 2."

The point indicated by Pilgrim, as the true location of the southwest corner, is 154.5 feet from the Grant, or last mentioned, stake. The shaft almost intersects the line between the claims; it is a "little bit" east of the line.

Pilgrim testified that he built a cabin on the Irishman near the place he and Grant had put the southwest corner stake, but not the one Grant mismarked, long before any dispute arose.

To find that the Grant stake correctly indicates the disputed southwest corner would be to find that Pilgrim had deliberately built his cabin some one hundred and more feet westerly of his own line.

The reproduced map (Defendants' Exhibit C) was prepared by a surveyor by the name of E. F. Wann. This map is drawn to scale of 1 inch to 200 feet. (Reduced by one half in the reproduction.) By scaling along an extension of the west end line of the Irishman claim on this map to a point 154.5 feet westerly, and then connecting this point with the northwestern corner of the Irishman as it is located on this map, most of the Wasp lode workings will be shown to lie on the Irishman side of the line. Other calculations on maps and surveys introduced, using only such parts thereof substitute word "as" are ascertained from known data, show confirmation of the correctness of this location of the line connecting the southwest and northwest corners. (True line sketched on map in dashes.)

The plaintiff testified that she saw the stake at the place indicated by Pilgrim. W. W. Estes testified that he saw the stake there between September and November in 1928 or 1929. Grant admitted (a) to Fred Deeming that the stake was at such place; (b) to Farrell that the stake was at or near such place; and (c) in his written statement furnished plaintiff that he was mining on the Irishman. This, with other evidence not necessary to be detailed here, convinces us, as it did the trial court, that the southwest corner of the Irishman is at the place

indicated by Earl Pilgrim and claimed by the plaintiff.

A glance at the reproduced map will show that practically all of the ore extracted from the Wasp lode by defendants was taken from an area directly under the surface of the Irishman. There is no evidence that attempts to point out the extent of the comparatively small amount that was taken from under the surface of the Wasp claim.

■ Since a "discovery," or the finding of a vein of mineral-bearing ore, is a necessary element of a valid mining location, a word regarding the subject of "discovery" will be appropriate. The first mining work done on either of the claims was by Earl R. Pilgrim and Grant on the Irishman. They sank a shaft near the center lengthwise line of the Irishman claim and by drifting discovered a mineral-bearing vein. This was a "discovery" for the Irishman claim. This vein is called the Irishman lode. Thereafter, in November, 1928, they signed notices and recorded them.

If the other vein, known as the Wasp lode situated near the dividing line, apexes upon the Wasp, as it is claimed it does (and as we find), then discovery is sufficiently established as to this claim. See foot note 1.

■ We next turn our attention to the location of the apex of the vein upon which Grant and the Mutchlers were working when they purchased the Wasp claim. "On principle, the identity of the apex of a vein with its spurs or extensions must be the crucial test by which are to be fixed the proprietary rights to that vein and the mineral therein." Butte & Boston M. Co. v. Societe Anonyme des Mines, 23 Mont. 177, 58 P. 111, 113, 75 Am.St.Rep. 505.

Earl R. Pilgrim, husband of plaintiff, testified that the Wasp lode shaft was about 100 feet. down to a drift southerly along the lead or vein about 100 feet. That there were stopes opened with chutes and raises driven up in the vein. The vein dipped about 40° above the level and inclined westward toward the top of the vein.

■ Irving McK. Reed, a mining engineer occupying the position of United States Game Commissioner and United States Mineral Surveyor, made an underground survey and map of these workings. (Plaintiff's Exhibit 3.) Admission of the map in evidence was objected to because the witness assumed the location of two corners in his survey. The court properly overruled the objection as the claimed defect could not affect the extent of the undersurface workings for which alone it was used.

Mr. Reed testified that the pitch of chute No. 4 was 35 feet up to 60 feet out; that the apex was beyond any point that was uncovered at that time, but while it was possible, it was not probable, that the vein doubled back into the Irishman.

Henry Joesting, a geologist and instructor of civil engineering at the University of Alaska, worked under the direction of Mr. Reed surveying the lode claim and assisting in drawing the map, Plaintiff's Exhibit 3. He testified that the map "correctly shows the pitch of the vein where the vein has been worked out and consequently would show the pitch of the vein." A glance at these drawings indicates a consistent slope of the vein upward, from east to west, from the hundred-foot level to but a few feet from the surface.

There is other evidence tending in the same way and no evidence inconsistent with this testimony.

■ The Wasp claim is a little more than 600 feet wide, and it seems to us that the evidence practically demonstrates that the apex of the lode or vein was within the boundaries of, or under the surface of, the Wasp, and we so hold. By referring to the reproduced map, with its corrected line between the claims, it will be seen that the ore was taken from beneath the surface of the Irishman and between the converging end lines of the Wasp. Thus the extralateral extension of the Wasp lode included the area from which the ore was taken.

■ At this point we may note that the end lines of the Wasp claim are not exactly parallel, but are substantially parallel. Since they converge in the direction of the vein dip, that part of the lode, extending beneath the Irishman surface and also within the Wasp end lines extended easterly, is pertinent to the Wasp lode, and is subject to the trust which we herein declare under the doctrine of extralateral rights. See foot note 1.

On September 24, 1932, Grant optioned [2a and 2b] one-half of his interest in the Irishman to the three Mutchlers in equal portions. This option provided for immediate possession and constituted the four named persons cotenants. Ever since such date the property has been mined by them together. On June 26, 1934, Grant and the Mutchlers and Farrell entered into an instrument in writing called "Assignment and Agreement," [2c] in which it is provided Farrell shall succeed to an equal interest with the Mutchlers in and to the option of September 24, 1932, which granted to the Mutchlers certain rights in Grant's interest in the Irishman, and Farrell assigns in equal portions his lease with the plaintiff. This lease dated January 20, 1934, granted to one C. E. Farrell certain mining rights on the Irishman. [2d] The agreement of June 26, 1934 further provides that Grant, the Mutchlers, and C. E. Farrell are equal owners and partners in the Irishman, and that Grant will forthwith transfer to each of the others from his one-half interest an undivided one-tenth interest in and to the Irishman.

It is apparent from this recital that the option under which the Mutchlers became interested in the Irishman through

[2a] Agreement of Sale between O. M. Grant and Mutchler Brothers made September 24, 1932. Grant in consideration of $150 received, agrees to sell the Mutchler Brothers an undivided one-fourth interest in the Irishman No. 1 (and interests in other claims), on condition that Mutchler Brothers pay $350 before June 1, 1933, and the additional sum of $1,000 out of the gold to be mined from the said claims. Grant agrees to place a deed to the various interests in question in escrow to be delivered to Mutchlers when the agreement is performed; the deed to be returned to Grant if the $350 is not paid when due.

[2b] Deed was deposited in escrow.

Indenture between O. M. Grant and "Mutchler Brothers" dated September 24, 1932.

Grant in consideration of $1 grants to Mutchler Brothers, "An undivided one-quarter interest in and to the Irishman No. 1 Lode Claim" (as well as various interests in other claims), together with the same interest in the improvements thereon.

[2c] Assignment and Agreement between O. M. Grant, First Party, Mutchler Brothers, a Co-Partnership, Second Party, George Mutchler, David Mutchler, and John Mutchler, Individually, Third Parties, and C. E. Farrell, Fourth Party, on June 26, 1934.

First party being owner of undivided ½ interest in Irishman No. 1 (and in another described claim) and Second party having under agreement of September 24, 1932, an option to purchase an undivided one-quarter of said claim, and having paid to first party $350 as provided in the option and having mined ore which first party believes came from the Wasp claim and which Edna G. Pilgrim claims to have come from the Irishman claims, and fourth party being the holder of an option from Edna G. Pilgrim of an undivided ½ of the Irishman claims, it is agreed that second party sells to fourth party an undivided interest in its option agreement of September 24, 1932; second party and fourth party agree that if the disputed ore came from Irishman then royalty payments to sum of $1000 under terms of mentioned option agreement to be paid to first party but if ore came from Wasp then first party to be paid royalty provided for in option agreement out of subsequent operations on Irishman; fourth party sells to first and third parties an undivided interest in and to the Pilgrim lease and option; the undivided ½ interest in individuals in equal shares, said five individuals thereby forming a partnership for the mining of the Irishman, first party to forthwith make deeds of conveyance to each of the other four individuals of an undivided 1/10 interest in and to the Irishman.

[2d] Lease and Option between Edna G. Pilgrim, as Lessor and Optionor, and C. E. Farrell, as Lessee and Optionee, Dated January 20, 1934. Lessor being the owner of an undivided one-half (½) interest in the Irishman No. One (1) and No. 2 lode mining claim covenants that lessee shall have the sole and exclusive right to mine it for three (3) years on condition that lessee shall take immediate possession and operate in a minerlike fashion, it being provided that lessor may forfeit if operations are ceased for a period of 90 days. Further provided that lessee to bear all expenses, lessor to have right of entry and lessee to deliver to lessor 7½% of the gross amount of all minerals extracted, lessee to retain the balance as his compensation. Lessee to have right to terminate on 30 days notice and to use of improvements on property, all improvements to become lessor's on termination of lease. Lessor may forfeit for violation of any conditions. Lessor further gives to lessee an option during life of lease to purchase said mining claims for $5000., all royalties paid under the terms of the lease to apply on said purchase price.

Grant has continued in full force and effect and was eventually ripened into a completed transfer of title to them.

After the Mutchlers first became interested they, with Grant, worked the Irishman lode, quitting it on May 14, 1933, and going to work on the Wasp lode.

The plaintiff succeeded to her husband's interest in the Irishman December 18, 1929, from which date the two, Grant and plaintiff, have been cotenants in the Irishman. And as we shall presently see, plaintiff and Grant have been cotenants of the Wasp since its purchase by Grant and George Mutchler about July 6, 1933. After acquainting themselves with the dip of the lode upon which Grant and the Mutchlers were working, Grant and George Mutchler negotiated the purchase of the Wasp without consulting or notifying their cotenant, the plaintiff, in any manner, withholding recordation of the conveying deed for some six or eight months.

The correlative duties of cotenants of adjoining mining claims in circumstances strikingly similar to those obtaining in our case have been ably discussed and determined in Cedar Canyon Consol. Min. Co. v. Yarwood, 27 Wash. 271, 67 P. 749, 752, 91 Am.St.Rep. 841.

In the cited case, some of the cotenants purchased interests in a bordering claim, the "Elephant," to protect the mining operations on the cotenant's claim, the "Legal Tender," when it became apparent that the Legal Tender operations were upon an extralateral extension of a vein apexing on the Elephant. The court said: "It was for the purpose of controlling such superior title in the interest of their common property that the purchase of the interest in the Elephant was made. The common title was assailed. It was believed that another had a better title, and one of the holders of the common title purchased an outstanding interest in such superior title. Under such circumstances we believe there was a tangible substance to which a cotenancy would attach, and that the parties sustained to each other the relation of co-tenants. A co-tenant will not be permitted to question the common title upon a contest between him and his co-tenants. Bornheimer v. Baldwin, 42 Cal. 27; Olney v. Sawyer, 54 Cal. 379; Freem.Co-Ten., 2d Ed. § 152. When the Deer Trail Mining Company No. 2" (one of the co-tenants) "purchased an interest in the Elephant claim, it was not in a position to question the common title to the Legal Tender, and, since the plaintiff company is the successor as grantee of the interest so purchased, it is not in position to assail the common title as a basis for establishing its own right of recovery. It must recover upon the strength of its own title, and we therefore think it is estopped to claim that there was no valid location made on the Legal Tender claim."

This is a state case and is not controlling, but we are impressed with the course and clarity of the reasoning used.

"But, it is said * * * that when a tenant in common makes use of the co-tenancy, or title, right, or claim under which it exists or is claimed to exist, to acquire such outstanding title, that upon this ground alone he will be held to have acquired it in trust for his co-tenants; and this proposition appears to be both reasonable and just." Myers v. Reed, C. C., 17 F. 401, 406. See, also, Hodgson v. Federal Oil & Development Co., 274 U.S. 15, 47 S.Ct. 502, 71 L.Ed. 901, 54 A.L.R. 869.

In the case of Turner v. Sawyer, 150 U. S. 578, 14 S.Ct. 192, 195, 37 L.Ed. 1189, wherein a cotenant acquired patent to a mining claim to himself alone, the court said:

"It is well settled that cotenants stand in a certain relation to each other of mutual trust and confidence; that neither will be permitted to act in hostility to the other in reference to the joint estate; and that a distinct title acquired by one will inure to the benefit of all. A relaxation of this rule has been sometimes admitted in certain cases of tenants in common who claim under different conveyances and through different grantors. However that may be, such cases have no application to the one under consideration, wherein a tenant in common proceeds surreptitiously, in disregard of the rights of his cotenants, to acquire a title to which he must have known, if he had made a careful examination of the facts, he had no shadow of right. We think the general rule, as stated in Bissell v. Foss, 114 U.S. 252, 259, 5 S.Ct. 851, [29 L.Ed. 126], should apply; that 'such a purchase [of an outstanding title or incumbrance upon the joint estate for the benefit of one tenant in common] inures to the benefit of all, because there is an obligation between them, arising from their joint claim and community of interest; that one

of them shall not affect the claim to the prejudice of the others.' Rothwell v. Dewees, 2 Black 613, [17 L.Ed. 309]; Van Horne v. Fonda, 5 Johns.Ch. [N.Y.] 388; Lloyd v. Lynch, 28 Pa. 419, [70 Am.Dec. 137]; Downer's Adm'rs v. Smith, 38 Vt. 464.

"A title thus acquired the patentee holds in trust for the true owner, and this court has repeatedly held that a bill in equity will lie to enforce such trust. Johnson v. Towsley, 13 Wall. 72, [20 L.Ed. 485]; Moore v. Robbins, 96 U.S. 530, [24 L.Ed. 848]; Marquez v. Frisbie, 101 U.S. 473, [25 L.Ed. 800]; Rector v. Gibbon, 111 U.S. 276, 291, 4 S.Ct. 605, [28 L.Ed. 427]; Monroe Cattle Co. v. Becker, 147 U.S. 47, 13 S. Ct. 217 [37 L.Ed. 72]."

See, also, section 2817, Comp.Laws Alaska, 1933; Wilkins v. Burton, 1833, 5 Vt. 76, 84; Comer v. Landrum, 1925, Tex. Civ.App., 277 S.W. 743.

We hold that the plaintiff and defendants (excluding George Mutchler) occupied the position of cotenants of the Irishman claim, and that Grant and George Mutchler learned through mining in the Irishman that the paying vein was an extralateral extension of the Wasp lode with apex on the Wasp claim, and that this knowledge was not communicated to their cotenant, the plaintiff, but that they proceeded surreptitiously to purchase the Wasp for their own exclusive benefit.

In the circumstances Grant (excluding George Mutchler) held and does now hold in trust for plaintiff one-half of his acquired interest of that portion of the Wasp lode which extends extralaterally beneath the Irishman claim and within the extended end lines of the Wasp claim.

There are cases in which courts have gone further than we have gone in this case and have impressed the trust as to the whole property purchased. Without taking the pains to distinguish such cases from the instant one, we think it is obvious that complete equity is done here by limiting the trust to the Wasp dip underlying the Irishman surface.

There is no dispute as to the net return from the Wasp; it is $24,581.61. Grant and the three Mutchlers were working this lode under the option agreement of September 24, 1932, under which the three Mutchlers together were operating with a one-fourth undivided interest and Grant a one-fourth undivided interest. If the plaintiff equitably owns one-half of that part of the lode from which the paying ore was taken, there can be no question but that she is entitled to one-half of this net sum. Or rather, in this case, the three defendants who were served with process must contribute to plaintiff in the following proportions to the whole sum: Grant must contribute one-half of one-half, and David and John Mutchler must contribute each one-third of one-half of such sum. There should be $75 credited to Grant on account of his pro rata·payment in the purchase of the Wasp which plaintiff has tendered. The net sums to be paid on this calculation are: By Grant,—$6,220.40; and by each John and David Mutchler, $2,046.46. [3]

It is true that Grant and the Mutchlers together did some work on, but took no ore out of, the Irishman lode, as distinguished from the Wasp lode, but all we know about that is that such work was comparatively small in amount. Lacking the data we cannot include its cost in the operating expense.

In the course of the trial plaintiff introduced Grant's written statement of expenses and receipts incident to his operations on the Irishman up to July, 1933, and this statement shows a net loss of more than his share of the total recovery from both Irishman and Wasp lodes. Plaintiff

---

[3] Statement of Account

(Made up from Exhibits 4, S and S-2)

| | |
|---|---|
| Total expenditures over recovery prior to Oct. 1932 | $17,720.24 |
| before Mutchlers interested (Irishman Lode) | * * * |
| Total expenditures from Oct. 1932 to July, 1933 (Irishman Lode) | 4,866.96 |
| Total expenditures after July, 1933 to trial (Wasp Lode) | 28,813.74 |
| | $33,680.76 |

| | |
|---|---|
| Total recovery Oct. '32 to trial... | $58,262.31 |
| Subtract gross expenses | 33,680.70 |
| Net return (Grant & Mutchlers) | $24,581.61 |
| One-half to plaintiff | 12,290.80 |
| One-half to be paid by Grant | 6,145.40 |
| One-quarter allowance purchase Wasp | 75.00 |
| Net sum attributed to Grant | 6,220.40 |
| Grant entitled to all expenses before contributing | 17,720.24 |
| Exceeding Grant's share | 11,499.84 |
| ½ net return (Grant & Mutchlers) | $12,290.80 |
| ½ to be paid by Mutchlers | 6,145.40 |
| Each Mutchler ⅓ (John & David) | 2,046.46 |

has not questioned these figures. A co-tenant working independently upon a mining claim need only divide the net return with his cotenant where expenditures have been reasonably necessary in developing the mine. The decree should provide for this situation, and since such expense far exceeds the net return to Grant from the Wasp lode, no money judgment should be entered against him. Nothing herein shall be taken to limit the right of Grant to offset the balance between his expenses and recovery in future accountings between himself and plaintiff, amounting to the sum of $11,499.-84. It is quite unnecessary to consider possible interests of C. E. Farrell. He is not a party to the action, and although he entered into an agreement with the plaintiff, and also an agreement with Grant and the Mutchlers regarding their several interests in the Irishman, it does not appear that either of these agreements directly affects the issues of this case.

■ We shall here notice certain assignments of error.

Objection was made to the receipt in evidence of a map (Plaintiff's Exhibit 1). Since its use was specifically limited to the purpose of illustrating the witness' (Earl Pilgrim) testimony, we perceive no error in its admission.

■ Objection was made to the receipt in evidence of a map (Plaintiff's Exhibit 2) on the ground that "It was not the best evidence." Proper foundation had not been laid but this was remedied, so far as the uses to which it was put by the trial court and by us, when its surveyor, John Quenboe, testified that he had made the parts so used from his own survey and that they are correct.

■ Defendants assign as error the sustaining of an objection to the question propounded to Grant regarding his intention when he contracted for purchase of the Wasp and whether it was to protect his interest in the Irishman, but the question was fully answered during the exchange of statements immediately following the objection.

■ Appellant assigns as error that: "The Court erred in proceeding with the trial of the case before all the necessary parties were properly before it, in that George Mutchler, one of the defendants, was a necessary party and had not been served with process and was not then before the court."

Section 2866, Comp.Laws Alaska, 1933, provides: "A tenant in common may maintain any proper action or proceeding against his co-tenant, for receiving more than his just proportion of. the rents and estates owned by them in common. * * *" And section 3393, Comp.Laws Alaska, 1933, provides: "The court may determine any controversy between parties before it when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, the court shall cause them to be brought in." The controversy between the parties in this case was determined without prejudice to the rights of George Mutchler, or any other person.

■ The appellant assigns as error the denial by the trial court of a motion to dismiss the action for the reason that no decision was rendered in the term in which the case was tried. The Alaska statute dealing with the disqualification of judicial officers and depriving them of authority to act as such when disqualified specifically provides that "this section does not apply to an application to change the place of trial or the *regulation of the order of business in court.*" Comp.Laws Alaska, 1933, § 3305. Judge Pratt's signing of a general order extending the term clearly falls within the italicized portion of the quoted statute, and, since this is the whole purport of the assignment, it falls to the ground.

The defendants at the trial objected to the determination of the dispute over the line dividing the Wasp and the Irishman and objected to the determination, as to where the Wasp lode apexed, by the court sitting in equity, claiming that these were law issues and that the United States Constitution guarantees jury trials for such issues. They assign as error the court's overruling of such objections.

■ The Seventh Amendment to the Federal Constitution guarantees the right to jury trials in all common-law actions involving more than $20, and this provision is effective in the Territory of Alaska, as it is in other territories. 48 U.S.C.A. § 23. Thompson v. Utah, 170 U.S. 343, 346, 18 S.Ct. 620, 42 L.Ed. 1061.

■ "It is not an objection to the jurisdiction of equity that legal questions are presented for consideration which might also arise in a court of law. If the controversy be one in which a court of equity

only can afford the relief prayed for, its jurisdiction is unaffected by the character of the questions involved." Holland v. Challen, 1884, 110 U.S. 15, 3 S.Ct. 495, 501, 28 L.Ed. 52; Barton v. Barbour, 1881, 104 U.S. 126, 133, 26 L.Ed. 672; Smith Engineering Co. v. Pray, 1932, 9 Cir., 61 F.2d 687, 689. The doctrine announced in these cases applies to equitable causes involving fiduciary relations between the parties. Kilbourn v. Sunderland, 1899, 130 U.S. 505, 9 S.Ct. 594, 596, 597, 32 L.Ed. 1005.

■ The trial court was correct in overruling the objection and in taking jurisdiction in equity of all the issues arising in the case.

■ We have carefully noticed all the other specifications of error, but do not believe they require special mention herein. We may also add that in an equity case an appellate court need not consider assignments of error based on evidence that has been received; the reason being that a chancellor will not consider evidence improperly before him. Kuzek v. Magaha, 9 Cir., 148 F. 618; Unkle v. Wills, 8 Cir., 281 F. 29; Jonah v. Armstrong, 10 Cir., 52 F. 2d 343; National Reserve Ins. Co. v. Scudder, 9 Cir., 71 F.2d 884; United States v. Fairbanks, 9 Cir., 89 F.2d 949; Missouri Pac. R. Co. v. Bartlett, 8 Cir., 79 F.2d 275.

The decree is modified so as to provide as follows:

That appellant Grant holds a one-quarter undivided interest in trust for the appellee in that portion of the extralateral dip of the Wasp lode, which extends in its dip beneath the Irishman No. 1 claim and within the extended end lines of the Wasp claim, all in accordance with the survey and measurements appearing upon the map, Defendants' Exhibit C, as modified by the corrected line connecting the northwest and southwest corners of the Irishman; that a money award be had by appellee against David and John Mutchler each in the sum of $2,046.46, with interest at 6 per cent. per annum (chap. 32, Laws of Alaska, 1935) from date of entry of the decree below, and for costs in the trial against the three appellants, John and David Mutchler and O. M. Grant (defendants in the trial court); and that the said three appellants have their costs on this appeal against the appellee; that there be no money award, aside from costs, against Grant; and, as so modified, the decree is affirmed.