# CHARLESTON.

CECIL *et al. v.* CLARK *et al.*

HALL *et al. v.* SAME.

Submitted November 2, 1899—Decided January 24, 1900.

1. WASTE—*Co-Tenant—Accounting.*

   Extraction of coal by one tenant in common without consent of another is waste, for which he must account to that other. (p. 402).

2. SEC. 14, CHAP. 100—*Construed.*

   Section 14, chapter 100, Code 1891, does not apply to waste by joint tenant or tenant in common. (p 406).

3. COAL—*Co-Tenant—Accounting.*

   If one tenant in common take coal from land without the consent of another, he must account to that other therefor, and cannot keep the proceeds of the sale of the coal, without accounting, on the theory that the portion of land furnishing the coal is no more than his just share. (p. 407).

4. COAL—*Co-Tenant—Accounting.*

   If one tenant in common use the common land, and exclude his co-tenant, he is accountable to such co-tenant, though he does not take beyond his just share of rents and profits. (p. 408).

5. CO-TENANT—*Use—Profits.*

   If a tenant in common use the land for purposes allowable by law to a tenant in common, but use no more than his share, and do not exclude a co-tenant, he is not accountable to him for rents and profits. (pp. 407-408.

Appeal from Circuit Court, Summers County.

Actions by W. P. Cecil and others and J. R. Hall and others, respectively, against E. W. Clark and others, trustees of the Flat Top Coal-Land Association. Decree for plaintiffs, and defendants appeal.

*Affirmed.*

J. S. CLARK, and A. W REYNOLDS, for appellants.

S. L. FLOURNOY, W. MOLLOHAN, E. W. WILSON and JOHN OSBORNE, for appellees.

Brannon, Judge:

As will be seen in 44 W. Va. 659, (30 S.E. 216), these cases have before been passed on in this Court. That decision settled that the tract of land involved in this litigation was held by tenancy in common by certain trustees, holding for the Flat Top Coal-Land Association, and Cecil and others, as heirs of Henley Chapman, and Sarah E. Torbett, as one of the heirs of Hall,—the trustees owning five and one-half tenths thereof; the Chapman heirs, four-tenths, and Mrs. Torbett, one-twentieth. The said trustees, claiming the entirety of the tract of land, and denying the Chapman and Hall heirs any right therein, took sole possession of the land, by leasing it for coal mining to the Elkhorn Coal and Coke Company and the Shamokin Coal and Coke Company; and said lessees established an extensive plant, and mined large quantities of coal, paying the said trustees, lessors, large sums of money as royalty,— amounting, it is claimed, to one hundred and thirty-five thousand four hundred and six dollars and twenty-seven cents, up to September 5, 1895, the date of the decree,— holding said land to be such common property and subject to such partition. The said decree, after declaring the shares of the parties in the land, directed an account to be taken of the moneys received by said trustees as royalties prior to the date of the decree; and, as to future royalties, it directed that said trustees pay into the Bank of Bramwell, to the credit of the causes, four-tenths and one-twentieth of all royalties accruing after September 5, 1895. At the instance of said trustees, the clause requiring such payment into bank was suspended on the execution of a bond by the Flat Top Coal-Land Company in the penalty of ten thous-. and dollars; and, said bond having been given, the said trustees continued to collect all the royalty. From the 5th of September, 1895, to April 9, 1898 (the later date being the date of the affirmance by this Court of the said decree), the four-tenths and one-twentieth of said royalties going to the Chapman heirs and Mrs. Torbett, collected between said dates, amounted to twenty-three thousand two hundred and sixty-seven dollars and forty-one cents. After the 9th of April, 1898, the royalty going to the Chapman heirs and Mrs. Torbett was paid into said bank, and

amounted on the 27th of January, 1899, to five thousand three hundred and thirty-five dollars and sixty-seven cents. On that date the court made a decree requiring the said bank to pay to a special receiver appointed by said decree (George E. Price) the said five thousand three hundred and thirty-five dollars and sixty-seven cents, as, also, eighty per cent. of any other sums which might thereafter be paid into said bank under said decree of September 5, 1895, and requiring said trustees of the Flat Top Coal-Land Association to pay over to said special receiver eighteen thousand two hundred and sixty-four dollars and forty-one cents, which, with five thousand dollars left in the hands of said trustees, to be thereafter disposed of, made up the twenty-three thousand two hundred and sixty-seven dollars and forty-one cents, collected by said trustees as aforesaid on account of the interests of the Chapman heirs and Mrs. Torbett in the royalties accruing between September 5, 1895, and April 9, 1898, as above stated. The said decree of the 27th of January, 1899, went on to direct that said special receiver pay out the said moneys to the Chapman heirs and Mrs. Torbett, thus finally adjudicating their right thereto against the said trustees for said land association. From this decree of January 27, 1899, the said trustees have taken this appeal. The moneys received by the said trustees prior to September 5, 1895, have not yet been disposed of by the circuit court, but await the coming in of the account of rents and profits directed by that decree to be taken. Further, by that decree commissioners were appointed to make a partition of the land between the said tenants in common according to their respective rights, directing them to assign to said trustees their share in such manner as to include in their share the portion or portions of the tract on which they had made improvements, if the same could be done without injury to the other owners; and, in case said portion of said tract embracing said improvements should be laid off to the trustees, the commissioners were directed not to take into the estimate of value any improvement placed thereon by the trustees, nor deduct from the value of the portion assigned to said trustees anything on account of the coal mined therefrom, but to estimate the value of such portion at

such sum as would be done if such portion of the tract had in it the coal so mined therefrom.

The appellants complain of the decree because it orders a distribution of any part of the royalties paid since September 5, 1895; claiming that the court should have held all of the royalties subject to its disposal until the coming in of the report of the partition commissioners, and the report of the commissioner in chancery as to rents, royalties, and improvements, as required by the decree of September 5, 1895. The trustees claim that as they took possession, and developed, by coal mining, certain parts of the land, they should be assigned their share of the land, so as to include the coal mines opened by them, and as this would not cover more than their share of the surface, and as all the coal sold by them came from that land, they should be allowed to retain the money from its sale, without accounting to the Chapman heirs and Mrs. Torbett for any part of that money, and that said heirs and Mrs. Torbett should be assigned their shares in the undeveloped land. The trustees base this position or claim on the well-established principle that, where one co-tenant has made improvements upon a part of the common land, such improvements should be included in the land allotted to him in the partition, if the land is partible, and it can be done without injury to the rights of others, and the further principle, held in *Dodson* v. *Hays*, 29 W. Va. 577, (2 S. E. 415), that when the nature of the property is such as to admit of its use by several, and less than his just share is used and occupied by one tenant in common in a manner which in no way hinders or excludes other tenants in common from in like manner using and occupying their shares, such tenant does not receive more than comes to his just share and proportion, within the meaning of section 14, chapter 100, of the Code, and is not accountable to his co-tenants for the profits of that portion of the property occupied by him. But does this case fall under that statute? The position mentioned would, on first impression, seem to be reasonable; but I repeat the question, does this case fall under that statute at all, or the decision in *Dodson* v. *Hays*? Instead of doing so, does it not fall under section 2, chapter 92, of the Code, saying that "if a tenant in common, joint tenant

or parcener·commit waste, he shall be liable to his co-tenants jointly or severally for damages?" The other statute (section 14, chapter 100, Code) provides that "an action of account may be maintained  *  *  *  by one joint tenant in common against the other for receiving more than comes to his just share or proportion." These two sections are in the Code. They do not mean the same thing. We must give each its construction. Where one co-tenant occupies land for agricultural purposes in the production of yearly crops, *fructus industriales*, or other legitimate use for such a co-tenant, it is plainly just that he be allowed to do so without accounting to his co-tenant for such use, unless he occupies more than his share of the land; otherwise, he would not have the use of his share of the land. But, if he excludes his fellow from like enjoyment of his share, he must account to his co-tenant for that co-tenant's share, whether the occupation covers more or less than the share of the co-tenant so occupying. Or, if he occupies more than his share, though he does not exclude his co-tenant, thus not leaving open for his co-tenant that co-tenant's share for his enjoyment, he must account to him for taking more than his· own just share of the profits. This liability to account did not exist at the common-law. Use as much as he might, however profitable, one co-tenant was not liable to account to another. But section 14, chapter 100, above quoted, changes this, by making him account for what is beyond his just share, to his fellow. Its only purpose is to change the common-law rule of nonaccountability as to the ordinary use of the common property which a co-tenant may legitimately make of it. Such legitimate use contemplated by that section does not waste the property by damaging the inheritance permanently, but leaves it, after such use, intact, uninjured, ready for partition, as before such use. That statute only says that if one co-tenant, by such lawful use for ordinary purposes, get more than his fair share, he shall account for the excess to him entitled to the excess. Such construction of this statute was given in *Williamson*, v. *Jones*, 43 W. Va. 562, (27 S. E. 411), and *Ward* v. *Ward's Heirs*, 40 W. Va. 611, (21 S. E. 746). But that statute does not apply to this case. If it did, the posi-

tion of the trustees would be tenable, as it is clear that the trustees did not take coal from a greater quantity of land than their interest would call for; but that statute does not touch this case, since it relates to rents and profits only in ordinary cultivation or other use authorized by law to one tenant in common, while we are dealing with unauthorized use,—with what is waste. Coal in place is a mineral, and part of the very substance of the land. As shown in *Williamson* v. *Jones.* 43 W. Va. 562, (27 S. E. 411), and 2 Am & Eng. Dec. Eq. 670, taking from the land any mineral by a tenant in common is waste, for which he must account to his co-tenant. He is liable under section 2, chapter 92, of the Code, above quoted. That deals with waste by a tenant in common; changing the common law, which did not make him liable therefor. 2 Minor, Inst. 429. The difference lies in the light in which the law views the act of production in the use of the common property,—we may say, in the article produced. Where one tenant in common takes wheat or apples, even in excess of his share, the law regards him as its sole owner; his co-tenant having no title therein, though the producing tenant is accountable for taking more than his just share. But when one takes coal his co-tenant has title to the very coal, after its severance from the land; and the taking tenant can be sued in trespass, or if he sells, his co-tenant can waive the tort, and sue for the money had and received, because the one has received money from the sale of property belonging to the other. When the one took the grain he did so with lawful authority, as he was entitled to occupy the land for the production of grain. But when he took the coal he did so without authority. His act was a wrong, a waste, in violation of the right of his co-tenant; and this co-tenant can follow up the property, and base his demand on its wrongful taking and conversion. The distinction is that one is waste, falling under a statute declaring, without qualification, that he who commits it shall answer, without any reference to whether he took more than his share or not, while the other is not waste, but authorized use, rendering him accountable, by the letter of the statute, only in case he takes more than his share. It does not seem that in cases in Virginia where tenants in common took salt water, lead, or iron ore,

it was contended that they could keep all their proceeds, without account to their fellows, on the theory that what was taken was no more than their fair share, or that it came from the land assigned to them. *Ruffners* v. *Lewis' Ex'rs.* 7 Leigh, 720; *Early* v. *Friend*, 16 Grat. 21; *Graham* v. *Pierce*, 19 Grat. 28; *Newman* v. *Newman*, 27 Grat. 714.

As to the point made by counsel, that the bill does not charge waste, or go on that theory. I have to say that it does so in a legal point of view. It charges common ownership, and charges that the trustees took coal from the land; and that in law constitutes waste, and relief would come under the prayer of general relief.

Another reason against allowing the trustees to keep all the money arising from the coal, without accounting to their co-tenants, on the theory that the trustees took no more than their lawful share, is that the trustees denied all title in the Chapman and Hall heirs, took sole possession, and excluded them from the land. Those trustees cannot say, or have the benefit of the theory, that they did not exclude the Chapmans and Halls, as they did not even concede their right when the Chapmans and Halls demanded a share in the land, but defended that suit through all the courts till the right of their adversaries was established. Therefore, if the taking of the coal is viewed, not as waste, but in the light of ordinary use for agriculture, and thus coming under section 14, chapter 100, of the Code, still the trustees must account, though they took less than their share, because of their exclusion of their co-owners. *Early* v. *Friend*, 16 Grat. 21, (Syl., point 2); *Rust* v. *Rust*, 17 W. Va. 901.

But the trustees, conceding for the moment that the case does not fall under chapter 100, section 14, and taking coal is waste, would fall back on a supposed general principle of equity, and say: "We have not occupied more land in mining than our share. All the coal taken by us came from the land occupied and improved by us, and, as that land can and should be assigned to us in the partition, we consequently ought to keep the proceeds of the coal, without accounting for it to the Chapman heirs and Torbett; and they should be compelled to take their share in undeveloped land, with its coal, which they may mine if

they choose." This does seem to be a strong proposition, but second thought presents a counter consideration over-throwing its force. If the trustees keep all the money, they keep money actually realized trom coal from a given area of land,—a certainty. The Chapman heirs and Tor-bett have to look to a like quantity of land for a like quan-tity of coal, producing an equal amount of money,—an un-certainty. Under this theory you call on equity to compel the Chapmans and Torbett to relinquish this money for what may not be realized. In the land undeveloped, which they would get, the coal may be less rich in quantity and quality. There is an element of hazard. In *Hall* v. *Vernon*, (decided this term) 34 S. E. 764, this court held that ownership in fee of natural gas and oil separate from the surface of the land is impartible, because gas and oil are fugacious, and no partition of them can be made, affording a reasonable guaranty of equality. While coal land, or only the coal in land, is more certain, and is partible, still there is an appreciable element of uncertainty touching it, great enough to forbid a court of equity from depriving a party of his right in what is in the land for what may never be there.

It is said that the trustees are entitled to keep the coal money because the decree of September 5, 1895, is *res judi-cata*, upon the question, and is violated by the decree of January 27, 1899. This calls upon us to construe the for-mer decree. The clause above quoted from that decree directs the commissioners ot partition to assign to the trus-tees their land, so as to include the land which they mined, if the same can be done without injury to other owners,, and, in case the mined land shall be laid off to the trustees nothing should be deducted from the value of that land for coal mined therefrom, but that they shall estimate the value at such sum as would be done if the land had in it still the coal taken therefrom. The trustees say that this provision finally gives and compels them to take the land exhausted by mining, and consequently lets them keep the money arising from the coal royalties since it cannot be that the court intended to force the trustees to take ex-hausted land, without deducting the value of the coal mined, and also yield to the Chapmans and Torbett their

share of the money. Can it be that the court intended the trustees to keep the money? If so, why does the decree order an account to be taken of what money had been received from the sale of coal before that decree, unless it was to charge the trustees, in favor of their co-tenants, for their share of the money? Why the explicit expression of the opinion of the court in the decree as to money coming from coal sold after the decree that the chapman heirs and Torbett were entitled to shares therein? This opinion is expressed with an emphasis making it almost decretal in character. This opinion that the Chapman heirs and Torbett had specified interests in the moneys thereafter received is given as the reason for directing such moneys to be paid into the Bank of Bramwell by the lessees, by fractions corresponding to the shares of the Chapmans and Torbett therein. This negatives all idea that the court designed finally to adjudge that the trustees should retain all the money arising from the coal. If the court so designed, it would have allowed the trustees to continue to receive, as they had been doing, all the money, instead of allowing them to collect only their part thereof, and directing the part proper for Chapman and Torbertt to be paid into bank. Indeed, rather can it be said that the decree decided that the money which should be deposited in bank should, if not at once, yet ultimately, go to the Chapmans and Torbett, because deposited as their shares, only to await final decree. The decree discloses that the trustees asked the court to suspend that clause of the decree directing payment into bank, in order to allow them to apply for an appeal, and this may be the reason why such deposit was directed. At any rate, we cannot construe the decree as giving the money to the trustees. It does not actually decree the money at once to the Chapmans and Torbett, but it says by way of recital, if you can call it recital. "And the heirs of Henley Chapman and William H. Allen being entitled to four-tenths, Sarah E. Torbett the one-twentieth, of all royalties hereafter accruing;" and it directed the lessees to pay into bank, "to the credit of these causes, four-tenths and one-twentieth of all rents or royalties payable under said leases for coal, timber, and material taken from said tract from this day until the fur-

ther order of the court." As just stated, the decree does
not purport to actually decree at once to the Chapmans and
Torbett the money, but it repels the claim that the decree
affirmatively holds that the trustees shall keep the money.
The decree may not be said to establish beyond recall the
right of the Chapmans and Torbett to the money, but it
can be said that it repels any claim that it gave to the trus-
tees that money irrevocably. Hence that clause is not vio-
lated by the subsequent decree actually directing the
money to be paid to the Chapmans and Torbett. But is
the clause of the decree directing the commissioners of par-
tition to assign to the trustees the land which had been
mined, without deduction from its value of the value of the
coal taken from it, violated by the later decree? That pro-
vision is not final, either that the developed land should go
to the trustees, or that it should go without deduction of
the value of the coal mined therefrom. I understand that
a decree for partition is final so far as it adjudicates the
shares of the partitioners, but not as to the manner or
mode of partition, or what land the parties shall severally
take. That is for adjudication in the decree of final parti-
tion, and is not usual or practicable in the first decree,
where a report of commissioners, or the ascertainment of
facts dehors the record, is essential before final decree, as
surely was the case in this instance. There could not pos-
sibly be a decree until after the commissioner's report.
The clauses of the decree seem to be inconsistent; but
that is no matter, if the decree be not *res judicata* upon
the question in hand, for any error or inconsistency is
then afterwards correctible. That clause directing the
commissioners to include in the land assigned to the trus-
tees the land which had been mined, without deduction for
coal mined, but to estimate its value as if no coal had been
mined, is not final, but merely tentative or experimental,—
to be adopted or rejected as the court might thereafter de-
termine. This must be so, from the nature of the decree;
it being not one of actual partition, but only one for parti-
tion,—a decree preparatory to final actual partition. It is
manifest such was the intent of the court, from the lan-
guage that the land which had been mined should be as-
signed to the trustees "if the same can be done without in-

jury to the interests of other owners," and that, "in case said partition of said tract embracing said improvement shall be laid off to the trustees, the said commissioners shall not take into the estimate of its value any improvements placed thereon by said trustees, nor shall they deduct anything on account of the coal mined therefrom," etc.

It is hardly necessary to say that, as the Chapmans and Torbett have elected to participate in the money, the trustees cannot, in the partition, be given the exhausted land, without deduction of the coal taken from it. The Chapmans and Torbett cannot have their full proportionate share of the land, as if never mined, and money also. As to the argument that the court erred in giving the money to the Chapmans and Torbett prematurely, before the coming in of the reports of partition and of rents and profits: It is said that whether the trustees shall be deprived of this money depends on the final determination of the question, whether they took more than their just share, and that this can only be determined upon the final account; but we hold that their accountability does not depend on that, but on the fact of waste. Having determined that the money goes to the Chapmans and Torbett, why withhold it longer from them? A large sum is in the hands of the trustees, received before 5th of September, 1895, in which the Chapmans and Torbett have a share, under principles above given; and that money has not yet been disposed of or passed on by the circuit court. This money is adequate to meet any demands for management or improvements, if any be allowed, and especially adequate in view of the fact that the improvements are mostly trade fixtures put up by the lessees, and removable by them,— not belonging to the trustees, who receive net money for royalty. I see no reason for keeping the money passed on by the decree of January 27, 1899, any longer from the people entitled to it, seeing that it cannot be needed for any future purposes of the case.

As to the disposition of the moneys from royalties paid prior to 5th of September, 1895, or the mode of partition of the land: These subjects, not being before us, remain for the action of the circuit court, and we express no opinion

thereon, further than as the legal principles above given may apply thereto.

The trustees claim that, as the husband of Mrs. Torbett is living, she is not entitled to her share of the money until his death, and that said trustees are entitled to its interest until his death, and that the decree erred in giving her her share at once. The former decision by this Court settled that point in favor of the correctness of the subsequent decree as to it.

*Affirmed.*