### WHITE et al. v. SMYTH et al.

No. 11662.

Court of Civil Appeals of Texas.
San Antonio.

April 9, 1947.

Rehearing Denied May 28, 1947.

954

Critz, Kuykendall, Bauknight, Mann & Stevenson, of Austin, L. D. Hill, Denman, Franklin & Denman, T. M. West and John A. Bitter, Jr., all of San Antonio, and Black & Stayton, of Austin, for appellants.

Carl Wright Johnson, of San Antonio, Ross Doughty, Jr., David R. White, Suttle & Kessler and D. W. Suttle, all of Uvalde, and Simmons & Smyth and Murray G. Smyth, all of Houston, for appellees.

NORVELL, Justice.

Appellants make the following statement of the nature of the case:

"This suit was filed in the District Court of Uvalde County, Texas, by Joe G. Smyth et al., hereinafter called appellees, against R. L. White et al., hereinafter called appellants, and against Lewis M. Smyth et al., who assumed the position of plaintiffs below and who are hereinafter referred to as appellees. Appellees alleged that they and the appellants owned the fee simple estate (including all rock asphalt) in and to a certain 200 acre tract of land in Uvalde County; that the same parties owned all the rock asphalt estate in and under approximately 30,000 acres of land which is mostly in Uvalde County but is partly in Zavala County; that appellants R. L. White and White's Uvalde Mines had removed a large quantity of rock asphalt

from the property owned in common and had failed to account to appellees for their portion of such rock asphalt. Appellees prayed that the 200 acre tract, including the rock asphalt estate therein, and the rock asphalt estate in the 30,000 acres, be found to be incapable of partition in kind and that the same be ordered sold and the proceeds divided among the owners thereof; and that the appellants R. L. White and White's Uvalde Mines be required to account to appellees for the rock asphalt removed from the common property and that appellees have judgment against said appellants for any sums that such an accounting showed to be due appellees.

"It is undisputed that appellants own an undivided one-ninth interest in the 200 acre tract and in the rock asphalt estate in the tract of approximately 30,000 acres.

"The case was tried before a jury; and in answer to special issues the jury found that the rock asphalt estate in the land in question cannot be partitioned in kind; that the reasonable value in the ground of the 397,338.11 tons of rock asphalt mined by appellants during the period of time involved in this controversy, that is from October 29, 1942, to September 30, 1945, was $99,334.53; that the net profit realized by appellants from the conduct of their rock asphalt business during this period of time was $250,180.56; that appellants' mining operations during the same period were not of such nature as to exclude the other owners of rock asphalt (appellees) from mining; and that appellants had not during the period in question 'mined more than one-ninth in value in the ground of the rock asphalt minable from all of the rock asphalt involved in this suit.'

"The trial court entered a decree reciting that the tract of 200 acres, including the rock asphalt estate therein, and the rock asphalt estate in the tract of approximately 30,000 acres, cannot be partitioned in kind. The decree ordered the common property sold and the proceeds distributed among the owners thereof, and awarded appellees a judgment against appellants R. L. White and White's Uvalde Mines in the sum of $222,382.72 (this being eight-ninths of the net profit realized by appel-

lants from their asphalt business) with interest thereon at six per cent per annum until paid."

Appellants rely upon eleven points for reversal or modification of the judgment. The first three points are grouped and described by appellants as "presenting the proposition that the trial court erred in holding that appellants, who have not mined more than their fair share of the rock asphalt in place, owe appellees the duty to account for rock asphalt mined by appellants."

The fourth and fifth points present the "proposition that if appellants owe appellees the duty to account, which appellants deny, appellants must account only for the value in the ground of the rock asphalt mined by appellants."

The remaining points attack the jury's findings to the effect that the mineral estates involved cannot be partitioned in kind.

After a thorough study and analysis of this case, we have come to the conclusion that the jury's findings that the property cannot be partitioned in kind have support in the evidence and control the disposition of this case. For that reason, we first discuss appellants' sixth to eleventh points, inclusive.

Some history of prior relationships between the parties and their mining experiences in developing the Smyth Ranch property may be of value in discussing these points.

The property here involved was the community property of J. G. Smyth and his second wife, Epsie Belle Smyth. J. G. Smyth died in 1915 and devised one-ninth of his one-half community interest in the property to each of his nine children. Two of these children, Mrs. R. L. White and Mrs. T. M. West were the daughters of J. G. Smyth's first wife. Their interests were acquired by R. L. White and amount to an undivided one-ninth interest in the entire estate. White did business under the name and style of "White's Uvalde Mines," and in 1941 conveyed an undivided one-twelfth interest in the business to each of his three children.

Mrs. Epsie Belle Smyth died in 1930, and her interest in the property passed by

will to her six sons and the four children of her deceased daughter. An agreed partition of the Smyth Ranch, save and except as to the rock asphalt therein, was effected in 1932. Also excepted from this partition was the 200 acre tract above mentioned, as a rock asphalt mine was then situated upon this tract. It seems to have been considered by the parties to this partition, that it was impracticable to attempt a partition in kind of the rock asphalt estate, so that the White interests continued to hold an undivided one-ninth portion thereof, while the Smyth interests held the remaining undivided eight-ninths fraction thereof.

On September 14, 1923, Mrs. Epsie Belle Smyth and the devisees of J. G. Smyth, deceased (with the exception of Ethel Smyth White, the wife of R. L. White, who was the owner of an undivided 1/18th interest in the property), entered into an agreement with R. L. White under the terms of which White acquired the right to mine and take rock asphalt from the premises. The royalty agreed upon was 25¢ per ton for the first 5000 tons taken from the land per month; 20¢ per ton for any amount over 5000 tons and up to 10,000 tons per month; and 15¢ per ton for any amount in excess of 10,000 tons per month. Under the agreement the lessors were to receive 17/18ths of the royalty in proportion to their respective interests. White also guaranteed that he would pay to lessors a minimum of $1,180.55 per month.

This contract provided for a ninety-nine year term, with a proviso which allowed White to terminate the same by paying to lessors the sum of $1000 and the additional sum of $13,222.22 as full compensation for the right to mine and take an additional 56,000 tons of rock asphalt from the premises.

In 1935 White moved to his present location, opened a mine, and since said date has been extracting rock asphalt therefrom.

White became dissatisfied with the provisions of the Smyth lease. He objected to the price agreed upon for royalty and to the provision whereby he was obligated to pay a minimum of $1,180.55 per month under his contract.

Being unable to secure the modifications of the lease which he desired, White, on October 30, 1941, took advantage of the cancellation clause in the contract and made a bank deposit of $14,222.22 to lessors' credit, which, under the provisions of the contract, entitled him to remove 56,000 tons of rock asphalt from the premises without further payments. White notified lessors that he would "mine the rock for which I have prepaid and then vacate the premises."

On November 13, 1942, White notified certain of the Smyths that he had taken his prepaid rock from the mine, but that instead of vacating the premises he intended to remove such part of his one-ninth interest in the rock asphalt as was practicable before moving his machinery. White also stated that he recognized the right of all other interested parties to do likewise.

On February 18, 1943, this suit was filed. The plaintiffs, among other things, sought to enjoin White's taking of further rock asphalt from the premises. No injunction was issued, however, and from October 29, 1942, when White completed the taking of the prepaid rock asphalt up to September 30, 1945 (the end of the accounting period insofar as this suit is concerned), White removed 397,338.11 tons of rock asphalt from the premises.

The record shows that the chief commercial use of rock asphalt is for street and highway paving purposes. The rock asphalt upon the Smyth property is primarily limestone, permeated with asphalt or bitumen. The bitumen content varies, depending upon the porosity of the basic rock and other geological and structural conditions. There is evidence that the beds on the Smyth Ranch vary from barren limestone to rock which is thirty per cent asphalt. Commercial rock asphalt generally carries from five to twelve per cent bitumen content. Highway engineers prescribe various specifications of bitumen content, depending upon the particular use proposed. Specifications vary from time to time. Because of these factors, blending is in most cases a necessary process in preparing the product for commercial use. For instance, the evidence shows that in the mine or pit operated by White, the rock at one end is

rich in bitumen content, while it is lean at the other end. Consequently, it is necessary to crush and mix the rock in order to produce a uniform bitumen content so as to meet contract specifications. The rock asphalt is then processed through a mixer where oil is blown into it under a pressure of 75 to 100 pounds. This oil fuses with the rock asphalt while big paddles grind the mixture. After the proper amount of oil has been mixed in with the rock asphalt, a certain quantity of water is added. The product is then ready for market.

Appellants refer to the end product as a "manufactured paving material." However, it seems that the product which is sold is essentially the same as the material taken from the mine. The process of preparing rock asphalt for market is comparable to the mining, tramming and smelting of metal bearing ores preparatory to market. The identity of the original mineral is not lost nor its qualities substantially changed. It remains rock asphalt.

In their argument attacking the jury's findings that the mineral estate involved can not be partitioned in kind, appellants, in effect, divide said estate into three parts according to surface lines. The Smyth Ranch contains some forty-five sections of land, but the asphalt mining and exploration work varies as to particular sections. It appears that intensive exploration work was done in connection with Sections Nos. 122, 133 and 215. White prepared a map of a proposed partition of the South one-half of Section No. 122, and portions of Sections Nos. 133 and 215. The land lying in each section was divided into nine parts by surface lines. White contends that this area is susceptible to partition in kind. In fact, upon the trial, he offered to take any one-ninth part which appellees would select.

Appellants also contend that there is no evidence as to the quantity and quality of the rock asphalt underlying the Smyth Ranch property outside of Sections Nos. 120, 122, 133, 214 and 215, and therefore the entire rock asphalt estate lying outside the five sections named may be partitioned in kind.

The third classification of the rock asphalt estate is the territory lying within Sections Nos. 120, 122, 133, 214 and 215, but outside of the area which White proposed to partition in kind, i. e., parts of Sections Nos. 122, 133 and 215. It is seemingly conceded that this portion of the rock asphalt estate is not susceptible of partition in kind.

The jury found that neither the whole nor any part of White's designated portions of Sections Nos. 122, 133 and 215 could be fairly and equitably partitioned in kind. Appellant attacks these findings as having no support in the evidence and as being contrary to the great weight and preponderance of the evidence.

Upon the trial appellant relied upon the testimony of Edwin L. Porch, Jr., and William A. Spice, Jr., experienced consulting geologists, who undertook to determine the existence, thickness and content of the rock asphalt under this particular area (portions of Sections Nos. 122, 133 and 215). Porch made a study of surface conditions, had access to cores taken from wells drilled upon the premises and the records thereof, and also had additional core wells drilled under his supervision. While it is conceded that the area in question is not underlaid with rock asphalt of exactly uniform thickness or quality, and that certain portions of the area are underlaid with no rock asphalt, it may be said that the picture presented by the testimony of Porch and Spice is essentially that of a mineral estate susceptible of partition in kind.

We can not, however, regard appellants' evidence on the point as being uncontradicted. Appellees produced geologists who challenged the accuracy of Porch's calculations. They also produced evidence which, if believed, casts doubt upon the accuracy of the core drilling employed as affording an accurate basis upon which to estimate the quantum of commercial rock asphalt in the area. Appellees point to substantial changes in the nature and bitumen content of limestone rock which occur within a comparatively small area; substantial differences in the thick-

ness of overburden or soil overlying the bitumen bearing limestone; the necessity for proper plant sites, access to water and various other considerations entering into the successful production of rock asphalt upon an economic or commercial basis. To review in detail the evidence relating to the point would extend this opinion beyond all reasonable proportions. Appellees devote at least three-fourths of a 255 page brief to a discussion of this matter. We have carefully considered the briefs of both parties, their references to the record and have concluded that there is evidence which supports the jury's findings, and that we would be unauthorized under the record to exercise our fact jurisdiction and set the findings aside as being against the overwhelming preponderance of the evidence.

"At common law, in proceedings for the partition of land, the cotenants were entitled to partition in kind if they demanded it, regardless of the difficulty or inconvenience of actual partition. Only by consent of the cotenants did the courts have power to order a sale of the land and a division of the proceeds among the common owners. However, the manifest hardship arising from the division of property of a practically impartible nature has been very generally circumvented by statutory provisions which give to a person entitled to partition the right to have the premises sold if they are so situated that partition in kind cannot be made, or if partition in kind would be clearly to the prejudice of the parties. A division of the proceeds of the sale among the co-owners in proportion to the value of their respective interests in the land thus takes the place of a partition of the property in kind." 143 A.L.R. 1092.

Partition by sale is provided for by Rule 770, Texas Rules of Civil Procedure, which reads as follows:

"Property Incapable of Division

"Should the court be of the opinion that a fair and equitable division of the real estate, or any part thereof, cannot be made, it shall order a sale of so much as is incapable of partition, which sale shall be for cash, or upon such other terms as the court may direct, and shall be made as under execution or by private sale through a receiver, if the court so order, and the proceeds thereof shall be returned into court and be partitioned among the persons entitled thereto, according to their respective interests."

In view of the jury's findings, the following statement from an annotation in the American Law Reports is an accurate statement of applicable law:

"Under equitable principles or under a valid and subsisting statute authorizing a sale of property in the event that a physical partition cannot be made unprejudicially, a sale rather than a partition in kind of mineral property or interests will ordinarily be directed if the inequity of an actual partition is made manifest by the circumstances, as where the aggregate value of the individual parts on partition would be less than the value of the whole as a unit, or appreciable difficulties in cost would be encountered with respect to the extraction or asportation of the minerals, or, the property being valuable chiefly for its minerals, elements of uncertainty, not resolvable at a reasonable cost, and defying a fair partition in kind, present themselves, in the form of such factors as the uneven or irregular distribution of the minerals, their undetermined location, extent, or quality, the speculative character of their value, or the presence of undefined faults or other imperfections affecting them." 143 A.L.R. 1102.

The Supreme Court of Alabama considered a case which in some respects is similar to the case at bar. In Sheffield Coal & Iron Company v. Alabama Fuel & Iron Company, 185 Ala. 50, 64 So. 67, 68, the appellee, owner of a two-thirds interest, sought partition against appellant, owner of the other one-third interest. In ordering a sale of the mineral estate rather than a partition in kind, the Alabama Court called attention to certain advantages to the co-owners available by sale which might be lost in having commissioners in partition estimate the value of portions of a mineral estate of uncertain quality or quantity. We quote from the opinion:

"It appears from the evidence that mineral underlies a part (small, according to definite indications found in the 'test pits')

of the lands; that this ore-bearing portion is of irregular shape; that it cuts across a quarter call, 160 acres of the land; that some of said tests indicate rich and some lean ore deposits; that the value of the land for its mineral deposits exceeds its value for agricultural purposes; that a problematical factor is present in the natural uncertainty attending the quantity and quality of the ore in the land, as well as the difference in the probable cost of extracting the ore from places where the overburden is great or small; and that the larger non-mineral acreage probably contributes to the enhancement of the value of that portion in which tests disclose mineral deposits. Furthermore it is entirely reasonable to take account, in the premises, of the suggested factor which may be denominated, as respects prospective values of undeveloped mineral for the purposes of sale, speculative values. The notion is based upon indications brought to view by tests, and the further fact, of which this evidence speaks, that no one can certainly tell the quantity or value of such ore deposits. There is a large element of chance in such matters. Some prospective buyers might reasonably anticipate, from the indications disclosed, a more favorable, flattering result from actual mining than would others. It would seem that the interest of all joint owners of such a tract would more certainly secure the best value for their unseparated holdings by a sale, whereat the optimism and expert foresight of prospective buyers might invite an appreciation of the value of that which in part is, the evidence shows, of uncertain value. Now, to partition in kind would necessarily largely omit the best availment of the advantage mentioned, since it would be for commissioners to ascertain quantity, quality and cost of mining and then apportion. The great uncertainty, to say nothing of other factors, of the success of such an effort to partition in kind is clearly inferable from the testimony of the witness Gass. He thought the ore tonnage could be ascertained to approximate correctness; but in this he is opposed by the weight of the evidence, if his use of the word 'approximately' is accorded its ordinary signification. If the term was intended to import a less accurate meaning, his evidence would be valueless, since to partition in kind would require some definiteness in quantity and quality of the ore and, not the least important, the ascertainment of the probable cost of extracting it."

Appellants lay much emphasis upon White's offer of partition. They say:

"The important facts are that appellants offered to take the asphalt under any one of the nine lots laid off by Porch in the south one-half of Section 132; under any one of the nine lots laid off by Porch in Section 133; and under any one of the nine lots laid off by him in Section 215. Appellants offered to let appellees choose the lots appellants would receive if appellants' interest in the rock asphalt estate should be set apart to them in kind."

White was an experienced rock asphalt operator and, in support of his contention that a certain part of the rock asphalt estate could be equitably partitioned in kind, his testimony to the effect that he was willing to take any one of nine shares under his proposed division may have been admissible as tending to show that said proposed shares were approximately equal in value. But we fail to see how White's offer can be given any other or further effect. The jury held against White upon the point and found the property was not susceptible of partition in kind, and, inferentially, that the respective values of White's proposed partition shares could not be ascertained with reasonable certainty. In the light of these findings, White's offer to appellees presented merely an opportunity to take a chance or speculate upon their receiving a share which might or might not be of greater proportionate value than the share which would be allotted to White under the plan proposed by him.

The issue of whether or not property may be partitioned in kind is determined by evidence. It is not determined by plans of settlement proposed by the parties during the course of litigation. Appellants advance various equitable arguments in support of a partition in kind. This form of partition is favored in law, but absent a proper factual basis this type

of partition can not be decreed. No objection is urged to the explanatory charges given by the trial court with reference to the submission of issues relating to the susceptibility of the property to a partition in kind. The issue was one of fact which was decided against appellants' contention upon sufficient evidence. We overrule appellants' sixth, seventh and eighth points.

We next consider appellants' ninth, tenth and eleventh points, which raise the contention (above mentioned) that the rock asphalt underlying all of the Smyth Ranch, with the exception of the part thereof underlying Sections Nos. 120, 122, 214 and 215, may be partitioned in kind. Here, again, the jury findings were against appellants.

Appellants rely primarily upon the case of Henderson v. Chesley, Tex.Civ.App., 273 S.W. 299, 303, wherein it was held that a partition in kind of a mineral estate was proper, it appearing that no exploration of the mineral resources under the 1,107 acre tract there involved had been made. It was not known whether or not there were any minerals of value lying beneath the surface of the land. This being the factual situation, the Court of Civil Appeals said:

"The law favors a partition in kind, rather than a sale with partition of the proceeds. Since there has been no development or exploration for minerals of any kind, in, on, or under the land in question, we think that the court should assume for the purpose of partition that each acre of the land contains an equal amount of minerals, and partition by dividing the surface. To assume that there are no minerals in the land would be to defeat the grant which undertakes to convey them. The assumption that each acre contains an equal amount of undeveloped minerals is exactly what is done when the fee is partitioned between joint owners, for a partition of the fee carries with it as an incident of title in fee a partition of any mineral interest not theretofore severed from the fee. If it is fair to assume in that character of partition that each acre contains a like amount of minerals, then no good

reason exists why the same assumption should not be indulged in a partition of the undeveloped mineral rights in land. To assume that no minerals are in or under the land, as appellants insist we should do, until it has been established that they do exist by development, would be to refuse a partition upon a mere conjecture or supposition that they do not exist in or under the land, and thereby defeat the grant which assumes that they do exist."

In the present case, although certain sections of the ranch were more extensively explored for rock asphalt than others, there are indications in the evidence that at least the greater part of the surface of the Smyth Ranch is underlaid with limestone of varying bitumen content. Under the evidence, no particular area of substantial size could be segregated as containing no rock asphalt. It appears that a stream, known as Turkey Creek, runs entirely across the middle portion of the ranch and passes in a winding course through twelve sections of land. It seems that rock asphalt in place is exposed throughout the course of this stream as it passes over the ranch. It appears that rock asphalt has also been exposed in the beds of other creeks, in wells, washes and gulleys and places where the top soil has been washed or taken away. Although definite and complete exploration of the entire ranch would cost enormous amounts of money, and the extent and value of the rock asphalt thereunder can not be ascertained from present available evidence, it can not be said that the presence of rock asphalt resources within the boundaries of the ranch is unknown, save and except as to Sections Nos. 120, 122, 133, 214 and 215. The indications of the evidence are that the mineral is present in this area and in substantial quantities.

The jury evidently concluded that although the presence of rock asphalt underlying the entire ranch was demonstrated, its distribution as to quantity and quality within the area could not be determined with a reasonable degree of accuracy. The jury found that a one-ninth interest in the rock asphalt estate in all the lands involved in the suit could not fairly and equitably be set aside to appellants in kind. This

finding has support in the evidence. No specific inquiry was made as to all the lands involved except Sections 120, 122, 133, 214 and 215. It was asserted in the motion for new trial that the evidence disclosed as a matter of law that the rock asphalt in all the lands except that underlying the sections named must be divided and partitioned in kind. Under the evidence, we are unable to agree with this contention. We overrule appellants' ninth, tenth and eleventh points.

 We now revert to appellants' contention that under the jury's findings White was under no obligation to account to appellees for the 397,388.11 tons of rock asphalt which he removed from the premises after his contract rights had terminated. As above indicated, we are of the opinion that the determination of the fact issue that the rock asphalt estate here involved is not susceptible of partition in kind controls the issue of accountability.

Assuming a case of a mineral estate partitionable in kind, a cotenant has the right to have the estate partitioned and his portion thereof set aside to him in kind. His substantive rights in and to the property are essentially the same whether he commences mining operations before or after he demands partition. Should he mine prior to a partititon his taking of · minerals may be regarded as working a partition effective at least as to the minerals actually severed from the ground.· These minerals belong absolutely to the mining cotenant. This for the reason that upon subsequent partition that part of the area under which the operating cotenant has mined may be set aside to him, provided, of course, he has not mined more than his proportionate share of the mineral estate. If the mining cotenant takes more than his share of a mineral estate or excludes his cotenants from the premises, different principles would apply, for he would have exceeded his legal rights, or committed a wrong, and it could no longer be said that the title to the severed minerals is vested absolutely in the taker.

On the other hand, if the mineral estate be not partitionable in kind, it follows that although a cotenant may be entitled to partition, he .is not entitled to a partition in kind, consequently, his taking of minerals prior to partition can not be regarded as vesting absolute title of the severed minerals in the taker. On the contrary, the title to the severed minerals remains in all the cotenants in their proportionate interests. The minerals not being partitionable in kind, the substantive right of cotenants desiring division or partition is the right to have the estate or minerals sold and the proceeds·thereof divided. It follows, therefore, that the title of the non-operating cotenant in and to the extracted minerals does not terminate until said minerals are disposed of by sale, or until they are brought to a place or point where there exists an established market value for such minerals. His rights thereupon attach to the proceeds.

From an examination of the reported cases (which we shall hereinafter discuss, with reference to the basis for accounting), we have come to the conclusion that accountability follows the taking of minerals by the mining cotenant whenever the mineral estate is not susceptible of partition in kind. We think this principle is readily apparent in the lode mining cases, the oil and gas cases, and the iron ore cases.

We hold that, under the jury's findings, White was under an obligation to account to his cotenants for their proportionate share of the 397,338.11 tons of asphalt mined by him. We overrule appellants' first, second and third points.

We next consider the basis of the accounting. As above pointed out, the jury found that the reasonable value of the 397,338.11 tons of rock asphalt taken by White from October 29, 1942, up to and including September 30, 1945, in the ground where taken and before its removal therefrom, was $99,334.53. On the other hand, the jury found that the net profits of White's mining operations and asphalt business during said period of time amounted to $250,180.56.

The evidence bearing upon the value of the rock asphalt in place seems to be based primarily upon estimates of royalty value. The jury in effect found that the rock asphalt taken by White had a value in place of twenty-five cents per ton.

The finding as to "net profits" was based upon evidence of sales of said 397,338.11 tons of rock asphalt amounting to $903,591.47, less expenses incurred in mining and processing the mineral. The jury seemingly took into consideration the value of the use of White's plant, salary for his services in connection with the operations and like items. No attack is made upon the jury's findings as to "net profits" by either side on the grounds that proper items of expense were excluded therefrom, or that improper items of expense were included therein. The judgment rendered is based upon the theory of "proceeds less expenses."

Appellants forcefully argue that "it is plain that if appellants must account to appellees, appellants need account for only eight-ninths of the value in the ground of the rock asphalt mined by appellants. If appellees have suffered any damage or loss, this is the extent of it. The trial court's judgment, however, not only makes appellees whole; it gives them something to which they cannot possibly be entitled— benefit of the experience, skill and capital of appellant R. L. White."

This position receives some support from two Pennsylvania cases, McGowan v. Bailey, 179 Pa. 470, 36 A. 325, 326, wherein it was said, "the value of the ore in place is, therefore, the only just basis of account (between cotenants)" and Appeal of Fulmer, 128 Pa. 24, 18 A. 493, 15 Am.St.Rep. 662, wherein it was said that, "the thing taken is mineral in place, as it lies in a state of nature. It is this of which the tenant out of possession is deprived, and it is this for which he ought to be compensated."

On the other hand, as pointed out by appellees, the result of adopting the "value in place" theory of accountability would be to allow White to take appellees' property under terms and conditions which appellees have refused to accede to by contract. With no contract and no guarantee of royalty payments of a specified sum per month (a contract stipulation insisted upon by appellees) White could take property in which they held an interest and would be accountable to them for a royalty only. In other words, the value in place theory allows the minority cotenant to take the property in which others have an interest and pay a royalty therefor, regardless of the wishes of the non-operating cotenants.

Ownership in cotenancy is subject to numerous disadvantages. It is impossible to accord to one cotenant all rights and privileges he would possess as sole owner without working a hardship upon the other co-owners. It is stated in the briefs that the issue of accountability and the proper basis thereof as between a mining cotenant and a non-operating cotenant in solid mineral properties has not been definitely settled in Texas. Although we regard the Texas oil and gas cases as having some application thereto, it does appear that no controlling solid mineral cases have been decided by the Supreme Court upon the particular points here involved. This being true, the decisions of courts from those sections of the country which have had a long experience with the legal problems incident to the mining of solid minerals must be given serious consideration. A theory or legal principle supported by experience is generally the safe guide to follow. When the effects of a rule of law upon an industry have been observed and the rule retained and continued in operation, an effective argument in support of the rule is presented. For these reasons we regard the lode mining cases as important authorities upon the questions presented here. The lode mining claim, with its peculiar incidents and rights (Grant v. Pilgrim, 9 Cir., 95 F.2d 562), presents a typical example of an estate which is but rarely susceptible of partition in kind. Further, cotenancy is a common form of ownership of such claims.

In the lode mining claim cases the right of the non-operating cotenant to an accounting seems well settled as is the basis or formula for such accounting.

In Kahn v. Central Smelting Co., 102 U.S. 641, 26 L.Ed. 266, a tenant in common holding a one-third interest, claiming to be a mining partner, sued for an accounting. He demanded a recovery of one-third of $35,000. Sixteen hundred tons of ore, having a value of $45,000 at the time of sale, had been extracted and sold. The cost of extracting and marketing said ore did not

exceed $10,000. The trial court held that there was no liability on the part of the operating cotenant to account. This judgment was reversed by the Supreme Court of the United States in an opinion by Mr. Justice Field, a recognized authority upon mining law. The Supreme Court held that the facts disclosed a mining partnership, and also discussed the rights of cotenants in mining property. We quote from the opinion:

"But if the relation of the plaintiff to his associates could not be considered as one of a mining partnership, he was still entitled to an accounting from them, if, as alleged by him, he was joint owner with them in the mine. They went into possession of the property under a conveyance from his co-tenants, and admit that whatever proceeds they have received from it were taken under a claim of ownership derived from that source. *They have,* upon their own averments, *only a claim in any event, to two-thirds of the proceeds; and if the plaintiff was a tenant in common with them, they can only refuse his demand to the other third by repudiating their own right to any portion. If a co-tenant, he had a right to call for an accounting, * * *."* (Italics ours.)

The case clearly proceeds upon the theory that ore taken from a mining claim (and these claims are seldom partitionable in kind) and the proceeds derived therefrom, belong to the co-tenants in proportion to their respective interests, although, in an accounting, the mining cotenant is allowed the reasonable expenses of extracting and marketing the mineral.

In Silver King Coalition Mines Co. of Nevada v. Silver King Consol. Mining Co. of Utah, 204 F. 166, by the Eighth Circuit Court of Appeals, it appears that defendant's predecessor in interest, as the operating cotenant had secretly entered the Vesuvius claim (owned by plaintiff and defendant as cotenants) by means of a deep shaft which it sunk from adjoining claims and removed large quantities of ore.

The trial court found that the defendant took "18,916 tons of ore of the first class, for which defendant realized $60.07 per ton, in all $1,136,284.12. The cost of mining, tramming and smelting this ore was $6.33 per ton, or $119,738.28, which left the net proceeds from it $1,016,545.84. There were 14,187 tons of second-class ore, whose net value was $3.53 per ton, in all $50,080.11. The sum of $1,016,545.84 and $50,080.11 is $1,066,625.95. The cost of the work done by the defendant within the Vesuvius claim in developing the ore was $34,097. Deducting this amount from $1,066,625.95, there remains $1,032,528.95, the total net value of the ore taken from the Vesuvius claim by the defendant. One-half of this amount, or $516,264.47, and the interest thereon, is the amount which the court found from these facts the defendant owed the complainant for its share of this ore."

The formula above set out was in substance adopted by the Circuit Court of Appeals as the proper basis for an accounting. It was held that although the defendant had surreptitiously mined the Vesuvius claim, it was not liable as a wilful trespasser. The Court said [204 F. 179]:

"In the case in hand, however, the intent of the defendant to appropriate all the proceeds of the ore to its own use did not render its entry upon the common property, or its extraction and preparation of the ore for market, unlawful. In this extraction, preparation, and sale it was not a trespasser. It was not acting without right. It was the owner of one half of every particle of the ore in its own right, and of the other half when extracted as trustee for its cotenant. It had the right to extract and sell the ore, in order that it might obtain its share of its value; and if it had accounted for and paid over to its cotenant in due time its part of the proceeds of the sales, no one would be so bold as to claim that it was not entitled to a just allowance for the reasonable expense of mining it, preparing it for the market, and selling it.

"In an accounting by a trustee in equity, the basic principle is that the account should be so stated that the trustee shall make no profit from his use of the property of the cestui que trust, and that the latter shall receive the just value of his property and its income. Other equitable rules and principles inform and guide the conscience

of the chancellor; but their application to the particular facts of each case is necessarily and wisely left largely to his discretion, to use them in such a manner as to work out the fundamental principle that governs the accounting.

"It is conceded that there is convincing evidence in this record that the defendant had the intent, before it extracted any of this ore, to appropriate it all to itself; that it entered secretly, and carefully concealed its extraction and sale of the ore for many years; that it mixed the ore with its own taken from other mines, which it owned in severalty; that it kept no separate account of this ore, or of its proceeds; and that it caved the stope from which it extracted it, so that it was difficult and expensive to ascertain the amount or value of the ore it took. But an evil intent does not make a rightful act wrongful, or an owner of property in its lawful possession a trespasser thereon (Stevenson v. Newman, 13 C.B. 285, 297; Allen v. Flood (1898)App.Cas. 114, 123), or necessarily subject a cotenant who extracts ore from the common property to the measure of damages for a willful trespass. It was a trustee for the complainant of its share of the ore it took, and of the proceeds thereof. As such trustee it violated its duty to notify its cotenant of its entry and taking of the ore, its duty to keep the ore separate, its duty to keep an account of it and of its proceeds, and its duty promptly to account for and pay to its cotenant its just share of the proceeds of the ore. Nevertheless, when this matter came to an accounting in the court below, the duty still rested upon the chancellor so to apply the rules and principles of equity jurisprudence to this accounting that the complainant should receive its just share of the value of the ore, or of its proceeds, and the defendant should make no profit by its breaches of trust."

The above case proceeds upon the theory that although a cotenant has a right to mine, yet he holds that part of the ore belonging to his cotenants as a trustee and is accountable as such. Instead of the mining cotenant owning the ore which he extracts absolutely, title to the same remains vested in the cotenants. We think this view fundamentally proceeds from the fact that the mineral estate or mining claim is not partitionable in kind. The case recognizes the proceeds or profits rule. Any formula of sales price or market price of severed ore less reasonable expenses necessarily includes profits, if any. And this follows from the concept of the continued existence of the tenancy in common in the severed minerals.

It appears that the State of Michigan follows the proceeds or profits rule with reference to accountability in iron ore estates held in cotenancy. The case of Campbell v. Homer Ore Co., 309 Mich. 693, 16 N.W.2d 125, 126, seems also to effectively answer appellants' contention that they are not accountable to appellees by reason of the jury's finding that appellants had not removed more than one-ninth in value of all the rock asphalt involved in the suit. This finding would be of controlling importance only in the event the jury had found that the rock asphalt estate was susceptible of partition in kind.

It appears from the report of the Michigan case that plaintiffs were the owners of a one-twenty-fourth undivided interest in the iron ore under a sixty acre tract, from which the defendant, holder of the remaining interest, had taken 52,000 tons of iron ore without securing plaintiff's agreement to said taking.

The Supreme Court of Michigan said:

"In order to escape liability to plaintiffs for their proportionate share of the value of ore mined and sold by them, defendant ignores its denial of cotenancy, and in effect claims that as long as $\frac{1}{24}$ of the total ore not removed or not mined at all on April 1, 1941, is still left, it is not liable to plaintiffs, and cites Fiquet v. Allison, 12 Mich. 328, 330, 86 Am.Dec. 54, as to sale of proportionate share of wheat which has been harvested and amount and quality precisely determined. The distinction lies in the fact that *iron ore in its natural situation is not capable of precise determination as to either quality or amount.* Lean ore unsaleable in one period may later be in demand. The tenant in common who takes possession is not vested with any superior right to choose what ore is to him most

convenient to mine, select what is more profitable and remove and sell without ac-counting. Hennes v. Charles Hebard & Sons, 169 Mich. 670, 675, 135 N.W. 1073; Cecil v. Clark, 47 W.Va. 402, 35 S.E. 11, 81 Am.St.Rep. 802. * * *

"Defendant is liable in this action to plaintiff for ½₄ of the value of the ore taken without agreement.

"Defendant denies plaintiffs' claim that the basis for allowance is ½₄ of the gross sum received for the ore without deducting the cost of mining. Defendant as a tenant in common was entitled to mine the ore and to deduct the cost though such cost might not be deductible to a mere wilful trespasser without any right or claim of title. Grant v. Fletcher, D.C., 283 F. 243. * * *

"The parties agreed that the total amount of ore mined from April 1, 1941, to commencement of suit was 63,166 tons. The value of the ore was $2.67 per ton, cost of mining $1.67 per ton, and value of plaintiffs' interest $.041⅔ per ton. On this basis plaintiffs are entitled to a judgment for damages in the amount of $2,631.91, with interest at 5% per annum computed from the date defendant received payment for plaintiffs' share of the ore to the date of entering a judgment." (Italics ours.)

In American Jurisprudence it is said that:

"Since any co-owner of a mine or mineral property is at liberty to work it, some courts have intimated that a co-owner who does not choose to avail himself of this right should have no claim upon the production of one who has elected to do so. But this view seems to be contrary to the weight of authority, and the prevailing rule appears to be that the producer must account to his cotenant for all profits made to the extent of his interest in the property." 14 Am.Jur. 104, § 36.

And that:

"When it is claimed that a cotenant in possession of a mine or a mineral property has become liable to his cotenants for profits accruing from his productive operations, the usual mode of settling the account is to charge him with all his receipts and credit him with all his expenses, thereby ascertaining the net profits available for distribution. In other words, the usual basis of an accounting by a cotenant who works the common mine or develops the common oil and gas property is the value of the product, less the necessary expenses of production." 14 Am.Jur. 106, § 38.

Our investigation convinces us that the prevailing American rule is that stated in American Jurisprudence. That authority, it will be noted, makes no distinction as to accountability between operating cotenants of mines from which solid minerals are taken and operating cotenants of wells from which oil and gas is produced. As to oil and gas, the Texas rule is that the co-tenant who produces oil or gas from the common property without having secured the consent of his cotenants is accountable to them on the basis of the value of the oil or gas taken less the necessary and reasonable cost of producing it. Davis v. Atlantic Oil Producing Co., 5 Cir., 87 F.2d 75, and authorities therein cited.

It is urged that since oil or gas is fugacious, the rule is not applicable to solid minerals. In Burnham v. Hardy Oil Co., Tex.Civ.App., 147 S.W. 330, 335, affirmed 108 Tex. 555, 195 S.W. 1139, the fact that "oil is a fugitive substance and may be drained from the land by well on adjoining property" is advanced as a reason for recognizing the right of a cotenant to drill for oil although all cotenants do not consent thereto. Mention is also made of the fact that ordinarily an estate in oil and gas is not susceptible of partition in kind. This latter consideration is, in our opinion, the controlling factor upon the question of accountability and the proper basis thereof. We think the Texas oil and gas cases support the basis for the accounting employed by the trial court in this case.

Appellants rely upon Kirby Lumber Company v. Temple Lumber Company, 125 Tex. 284, 83 S.W.2d 638, wherein it appeared that an oral partition of the Ogden Survey of 640 acres of timber land had been effected between John A. Morris (the owner of a one-third undivided interest) and N. W. Weatherred (the owner of the remaining two-thirds undivided interest).

Some timber was cut from the Morris 213 acre tract. The Kirby Lumber Com-

pany afterwards acquired the Morris interest, but the deeds in its chain of title described the property as an undivided interest in the 640 acres. The Temple Lumber Company acquired the Weatherred interest. Certain instruments in its chain of title described the land as a two-thirds undivided interest in the Ogden Survey, and others described the property as 427 acres, being all of said survey except 213 acres off the east end thereof owned by John A. Morris.

The Temple Lumber Company entered upon the premises and cut all the timber on the West 427 acres, which by reason of prior cuttings on the East 213 acres was more than two-thirds of the timber standing on the entire tract at the time the Kirby Lumber Company had acquired its interest in the survey.

The Supreme Court held that the Kirby Lumber Company had acquired its interest in the survey without notice of the oral partition made by Morris and Weatherred, consequently, they were the owners of an undivided interest in the timber standing upon the entire section and not the owner in severalty of the timber standing upon the East 213 acres of the survey. It was held that the Temple Lumber Company was liable to account to the Kirby Lumber Company for the stumpage value (value in place) of the timber cut by it in excess of two-thirds of the amount of the timber standing upon the entire survey.

There are perhaps several distinctions which may be made between the Kirby Lumber case and the case at bar; the most important being that set forth in the opinion itself. The Supreme Court adopted the "innocent trespasser" theory of accountability, which is not suggested by the facts of this case.

Although the jury had found that the Temple Lumber Company had acted negligently and in reckless disregard of the rights of the Kirby Lumber Company in cutting the timber from the 427 acre tract, the Supreme Court said [125 Tex. 284, 83 S.W.2d 646]:

"When we come to examine this record we are compelled to the conclusion that in cutting and appropriating this timber Temple Lumber Company acted in good faith, and without malice, actual or implied. In this connection there is certainly not a line of evidence in this record to show actual malice on the part of Temple Lumber Company, and the facts are not such that malice can be implied. We think that the undisputed record shows that at the time Temple Lumber Company purchased this land and at the time it cut the timber on this 427 acres it believed in good faith that it owned in severalty such 427-acre tract and all the timber growing thereon. This belief was not the conclusion of a reckless or imprudent person, and was not without substantial foundation."

Premised upon this finding from the undisputed evidence, the Supreme Court quotes from E. E. Bolles Wooden-Ware Co. v. United States, 106 U.S. 432, 1 S.Ct. 398, 400, 27 L.Ed. 230, as follows:

"On the other hand, the weight of authority in this country as well as in England favors the doctrine that where the trespass is the result of inadvertence or mistake, and the wrong was not intentional, the value of the property when first taken must govern, or if the conversion sued for was after value had been added to it by the work of the defendant, he should be credited with this addition."

By quoting American Decision notes (24 Am.Dec. 77), the Supreme Court makes reference to an English case by Baron Parke, which applies the "innocent trespasser doctrine" to the mining of solid minerals. The excerpt from the notes and opinion is as follows:

"A leading English case on this point is a nisi prius decision by Parke, B., in Wood v. Morewood, 3 Q.B. (Ad. & Il. N.S.) 440, in notis. That case, it appears, was an action for an injury to the plaintiff's reversion in certain closes by making holes and excavations, and getting coals, with a count in trover for coals. The defendant had taken the coals bona fide, supposing the land was his own under a purchase from Sir John Zouch. Parke, B., told the jury that 'if they found for the plaintiff, they were to determine what damages should be given; that if there was fraud or negligence on the part of the defendant,

they might give as damages under the count in trover, the value of the coals at the time they first became chattels, on the principle laid down in Martin v. Porter (5 M. & W. 351); but if they thought that the defendant was not guilty of fraud or negligence, but acted fairly and honestly in the full belief that he had a right to do what he did, they might give the fair value of the coals as if the coal fields had been purchased from the plaintiff.'"

We think the various bases of accounting are made clear by the opinion of the Kentucky Court of Appeals in New Domain Oil & Gas Co. v. McKinney, 188 Ky. 183, 221 S.W. 245, 250, wherein it was said:

"The right of one cotenant to himself occupy and operate the joint property also prevails in the case of a joint ownership of minerals. Thornton's law of Oil & Gas, § 312. In such case, if the occupying tenant, acting in good faith, believed that he had exclusive title to the joint property, he will be liable to account to his cotenant for the value in situ of his portion of the property converted, which also seems to be the rule applicable to an innocent trespasser. (Citing authorities.) * * *

"In cases of a willful trespasser the rule seems to be well settled, as will be seen from the authorities, supra, that the plaintiff is entitled to recover, in a suit for an accounting, the value of the mineral, without deducting any expenses incurred in mining it. But we do not understand that this stern rule should be applied in cases where a cotenant operates the mine with the knowledge of his cotenants' interest. Especially should this rule not be applied against a cotenant, where the mineral involved is of a fugacious nature and liable to be exhausted by adjacent operators. In such case, if one tenant is able and willing to develop the mine and extract the oil before it is entirely lost, and his cotenant is not, he should be allowed to do so without incurring the penalty of accounting to his cotenant for the gross amount of oil produced; but since he may not convert, to any extent, his cotenant's interest, he must account to the latter for his proportion of the net value of the oil produced, which is

its market value, less the cost of extracting and marketing."

 It is our opinion that in view of the facts as found by the jury, the trial court applied the proper rule of accountability. We overrule appellants' fourth, fifth and sixth propositions of law.

It is argued with force and persuasion that the decree of the trial court will operate to the great disadvantage of White, and will result in hardship and inequity. On the other side, it is contended that any other form of decree would work injustice to the Smyth appellees. These respective disadvantages arise from the very nature of the estate of cotenancy. White's conception of his legal rights and his resultant operations were predicated upon a conclusion as to the facts, which was not accepted by the jury. In our opinion the trial court followed the established applicable rules of law in determining this controversy. Consequently, the judgment will be affirmed.