NO. 07-07-0241-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JANUARY 7, 2009

_____

DON D. JOHNSON, ET AL.

Appellants

v.

LA MESA FARMS, INC.,

Appellee

_____

FROM THE 121st DISTRICT COURT OF YOAKUM COUNTY;

NO. 8390; HON. KELLY G. MOORE, PRESIDING

_____

*Memorandum Opinion*

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Don D. Johnson, et al. (Johnson) appeals from a judgment rendered in favor of La Mesa Farms, Inc. (La Mesa) wherein a sheriff's sale was ordered on a certain tract of real estate. Via four issues, he contends that the 1) trial court failed to apply the correct legal standard and correctly balance the equities of the co-tenants, 2) evidence was legally and factually insufficient to support the finding that the subject property was not susceptible to partition or that a fair and equitable division could not be made and 3) trial court incorrectly balanced the equities of all of the co-tenants. We affirm.

## *Background*

This appeal involves a forced sale of a 162 acre tract of land located in Yoakum County, Texas.[1]  In La Mesa's petition, it alleged that the property was "partially non-farmable pasture and partially land capable of being farmed."  Furthermore, the "land [was] incapable of being partitioned in equal shares among the various owners, and the land [was] not capable of division in kind."  In all, 29 co-tenants owned interests ranging from 23.2222% to 2.6666%.  La Mesa claimed to be a fee simple owner of 23.2222% undivided interest in the land.

At trial, the parties stipulated to the identity of the property owners and their respective percentages of ownership.  So too did Lynn David Guetersloh testify as president of La Mesa.  He stated, among other things, the following: 1) there were no improvements on the subject property, 2) the land was "raw native, pasture," 3) the majority of the top soil was made of sand, 4) La Mesa owned a 23.2222% interest in the property, 5) the interest was purchased with the idea of using an irrigation pivot system to water the land, 6) he had to remove the mesquite and level the land so that the system could pass over the land, 7) he undertook extensive labor to modify the property, 8) two things precipitated the forced sale, those being Johnson's re-negotiating a lease with La Mesa for more money and the possibility that other co-tenants would come forward demanding the same amount which in his view was unreasonable, 9) the property was comprised of 162.5 acres, 10) he cleared and cultivated approximately 130 acres, 11) some acreage within the tract was of no value to anyone, 12) the land lacked public access, 13) the land was not

---

[1]The property is described as the Southwest Quarter (SW/4) of Section 182, Block D, John H. Gibson Survey, Yoakum County, Texas.

good for grazing cattle, 14) the property's surface consisted of "high clay hills to sandy low spots even down into some darker soil on portions of it," 15) the value of the land would be approximately $125 per acre, 16) with modifications the property would be valued at $250 - $275 per acre, 17) the total fair market value of the property was $40,000, 18) he did not believe that the tract could be divided equally, and 19) if it was divided the division would immensely impair the land's value.

On cross examination, Guetersloh admitted that 1) La Mesa only started farming the land so that it could complete the circle with the pivot system being used, 2) he never contacted the other co-tenants to negotiate leases with them, 3) La Mesa participated in the USDA Farm Service Agency farm programs and received payments from the government which it kept, and 4) La Mesa predominantly wanted the land for access and for the half mile pivot system.

The defense called Ronita de Cordova Miller (Miller) who testified that 1) the property was Relinquishment Act land, 2) the land "should all stay together, that we oversee it and make sure that it is used for the best benefit of the State of Texas as well as ourselves," 3) that neither she nor her relatives desired a forced sale of the land, 4) she believed La Mesa could partition its portion and leave the rest of the property intact, and 5) the State would receive the royalties arising from mineral development. Yet, other evidence revealed that the mineral deposits were not equally dispersed throughout the subsurface. Also, little to none were located under the portion of land covered by La Mesa's sprinkler system, *i.e.* the portion of the land its opponents suggested that it receive via a partition in kind.

Doug Laufer also testified on behalf of the defense and stated that 1) he was presently an independent landman involved in oil and gas exploration, 2) Relinquishment Act land involved the State's sale of the surface estate while retaining the mineral interests, 3) according to the Relinquishment Act, the surface owner had the duty to act as the agent for the State in leasing the minerals and negotiating not only the bonus but the terms of the oil and gas lease provided that they use the general land office form of lease which contained many provisions associated with leasing minerals, 4) a dry well was drilled in 1965, 5) Transglobal leased a majority of the property for mineral exploration and a well had been drilled 562 feet south of the subject property, 6) based upon documentation filed by Transglobal, it "believe[d] they're going to produce hydrocarbons," 7) this investment would affect the value of the subject property, 8) the land was worth around $152 per acre, and 9) an equal division of the property would not affect its overall value. On cross examination, he agreed that 1) five dry holes had been drilled in close proximity to the subject property, 2) a possibility existed that dividing the property into equal parts could render some parts more valuable than others, and 3) the documents filed by Transglobal did not mean that they would be drilling on the subject property.

The next defense witness was Sam Middleton (Middleton) who testified that 1) he had been in the farm and ranch real estate and appraisal business for approximately 37 years, 2) the subject property was "sandy land, highly erodible type land," 3) the best use of the land would be to continue the leasing of minerals, 4) Guetersloh could sign a lease with the landowners, be given an easement to use his sprinkler system on the land, or partition out his interest, and 5) the property could be partitioned in a fair and equitable manner.

4

After the foregoing witnesses testified, both parties rested and closed. The trial court ultimately rendered judgment on March 28, 2007, and found that "a fair and equitable division of the [property] . . . [could not] be made, and that [the] property should be sold . . . ." It further concluded that 1) "[t]he share or interests of each of the joint-owners or claimants in the real estate that is the subject of this suit [was] as set out on Exhibit 'A,' which" exhibit was attached and incorporated into the judgment, 2) "[n]o party [was] entitled to reimbursement and/or offset against any other party arising out of legal and/or equitable arguments," 3) "[n]either the property nor any part thereof [was] susceptible of partition," and 4) "[a] fair and equitable division of the real estate [could not] be made." It then ordered that the "entire property . . . be sold," and that the "proceeds of the sale . . . be returned to the court to be partitioned among the persons entitled thereto." Johnson appealed that decision.

### Issue One  - Incorrect Legal Standard

Johnson contends in his first issue that the trial court applied an incorrect legal standard when determining that the property was not susceptible to partition in kind. That is, it used the "shattering" test which test was manifestly wrong and contrary to Texas law. Furthermore, the law purportedly favored partition in kind over a forced sale. The facts upon which it based the argument were that 1) La Mesa was the only co-tenant who wanted partition and a forced sale, 2) 65% of the owners did not want the forced sale, and 3) the segregating test for partition was the correct standard, that is, the trial court should have segregated La Mesa's 23.2222% interest (or 37.6 acres) from the other land even though the land to be segregated had no minerals underneath it while other parts of the tract did. We overrule the issue.

5

*Applicable Law*

That a co-tenant has an absolute right to partition is beyond dispute. *Beago v. Ceres*, 619 S.W.2d 293, 295 (Tex. Civ. App.–Houston [1ˢᵗ Dist.] 1981, no writ). The dispute, however, usually involves the manner in which partition should be effectuated. According to Texas Rule of Civil Procedure 770 which governs the forced sale of land, if

> . . . the court be of the opinion that a fair and equitable division of the real estate, or any part thereof, cannot be made, it shall order a sale of so much as is incapable of partition, which sale shall be for cash, or upon such other terms as the court may direct, and shall be made as under execution or by private or public sale through a receiver, if the court so order, and the proceeds thereof shall be returned into court and be partitioned among the persons entitled thereto, according to their respective interests.

TEX. R. CIV. P. 770. Furthermore, whether such a fair partition can be had is a question of fact for the factfinder to decide. *Cecola v. Ruley*, 12 S.W.3d 848, 853 (Tex. App.–Texarkana 2000, no pet.). Next, since the law favors partition in kind over partition by sale, the burden of proof falls upon the party seeking a forced sale to justify it. *Id.* If the proponent carries his burden and establishes that the property is not susceptible to partition in kind, there must be a partition by sale. We finally note that §23.001 of the Texas Property Code allows a joint owner or claimant of real property or an interest in real property or a joint owner of personal property to compel a partition of the interest or the property among the joint owners or claimants under this chapter and the Texas Rules of Civil Procedure. TEX. PROP. CODE §23.001 (Vernon 2007).

*Analysis*

Review of the statutes and rule mentioned above disclose that even though the law may favor a partition in kind, partition may nonetheless occur through a forced sale of the entire property. Which option to apply is simply dependent upon the evidence presented

at trial, despite the respective desires of the parties. Furthermore, neither statute nor rule of procedure requires that a majority of the joint owners acquiesce in or petition for the sale.

Second, and to the extent that Johnson believed the "segregating standard" was the correct method for partitioning the property, Rule 770 indicates otherwise. Again, it provides for the sale of so much of the tract the trial court deems necessary if "the court be of the opinion that a fair and equitable division of the real estate, or any part thereof, cannot be made . . . ." TEX. R. CIV. P. 770. Therefore, Johnson was mistaken in suggesting that the law precluded "shattering" of the land.

### Issues Two, Three, and Four - Insufficient Evidence/Did Not Assess Equities

We consider the last three issues together since they are interrelated. Through them, Johnson contends that the evidence was legally and factually insufficient to support the finding that the property 1) was not susceptible of partition and 2) could not be equally and fairly divided. So too does he argue that the trial court failed to balance and consider "all equities between the co-tenants." We overrule each issue.

*Applicable Law*

When the record contains conflicting evidence regarding the susceptibility of partitioning land in a particular way, the manner of partitioning is for the jury or trier of fact to determine. *Rayson v. Johns*, 524 S.W.2d 380, 382 (Tex. Civ. App.–Texarkana 1975, writ ref'd n.r.e.); *see also White v. Smyth*, 147 Tex 272, 214 S.W.2d 953, 960 (1948) (finding that evidence was sufficient to raise issues of fact and to support jury's finding regarding the land's susceptibility to partitioning). Consequently, we cannot simply substitute our judgment for that of the factfinder.

7

According to the record, Guetersloh acquired his interest in the land via a tax sale. When purchased, the realty was "raw native, pasture" composed in large part of sand. Nonetheless, he bought it so that a pivot sprinkler system that had already been installed on adjacent lands he farmed could make a complete rotation without having to back up. Moreover, while sectors of the property could be improved for farming others could not. So, each acre was not necessarily like every other acre. Consequently, Guetersloh testified that the land could not be divided equally without impairing its value given the lack of uniformity in land quality.

Next, other evidence indicated not only that various dry wells had been drilled around the property but also that one well on the property which had produced minerals was plugged a number of years ago. Data also revealed that to the extent minerals may exist under the surface, they too were not spread uniformly throughout the tract. So, dividing it into parcels would result in some surface owners being excluded from the benefits of mineral production. Furthermore, one such parcel of land was the acreage adjoining Guetersloh's other property. Johnson quite candidly argued that since Guetersloh wanted that land to facilitate his farming efforts, that is the land he should receive. Such a result would leave the remainder intact for the others to enjoy. That the result would effectively deprive Guetersloh of also profiting from the underlying minerals appeared to be of little concern to Johnson and his colleagues. As stated in their brief, "neither the courts nor the co-tenants have a duty to protect La Mesa from itself." This, however, seems at odds with Johnson's general theory that the trial court should have considered the equities of all involved. One could legitimately question as equitable the proposition that Johnson and his group retain lands which they deemed valuable while

8

giving La Mesa property which they believed had little value. So, despite the contention that the trial court was not obligated to protect La Mesa "from itself," the court remained free to consider all the equities involved irrespective of the parties' contentions. And, by ordering that the land be sold and the proceeds distributed was a reasonable means of allowing all to reap whatever benefit may arise from the presence of minerals under the tract. Simply put, the potential for mineral development and acting as agent for the State could be factored into the sale price. Additionally, no one has referred us to any legal impediment barring Johnson and his colleagues from bidding and buying the land at the sale. So, in ordering that the land be sold and proceeds distributed, it could be said that the trial court struck a balance that affected all in the same way, and we hesitate to say that the potential for being treated equally is inequitable.

In short, there was and is more than a scintilla of evidence supporting the trial court's findings. And, given the tenor of the record we cannot say that the resolution struck by the court was so against the great weight and preponderance of the evidence as to evince a manifestly erroneous or unjust result. Nor can we say that the factfinder neglected to consider and balance the equities of *all* involved.

The judgment of the trial court is affirmed.


Brian Quinn
Chief Justice

9